(263 P.3d 867)
No. 103,936

STATE OF KANSAS, *Appellee*, v. JACOB WALDRUP, *Appellant*.

Opinion filed October 21, 2011.

*Shawn E. Minihan*, of Kansas Appellate Defender Office, for appellant.

*Jim Garner*, of Lawrence, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., MARQUARDT and HILL, JJ.

MALONE, J.: Jacob Waldrup appeals his convictions of two counts of sale of cocaine, third offense. Waldrup claims: (1) Sale of cocaine is an alternative means crime based on the definition of sale given to the jury, and there was insufficient evidence to find him guilty of each alternative means of committing the crime; (2) the State violated his speedy trial rights under the Agreement on Detainers, K.S.A. 22-4401 *et seq.*; (3) the State violated his constitutional right to a speedy trial; (4) the district court erred in refusing to give a jury instruction on the testimony of a confidential informant; (5) the district court erred in limiting his cross-exami-

nation of the confidential informant; (6) the district court erred in failing to give a unanimity instruction in a multiple acts case; and (7) he was denied a fair trial based on cumulative error. We find each of Waldrup's claims to be unavailing, and we affirm the judgment of the district court.

On or about June 24, 2007, Cynthia Roubison called the Douglas County Sheriff's Office and spoke with Deputy Chris Thomas, who was assigned to the Drug Enforcement Unit (DEU), which works to regulate drug trafficking by using either undercover officers or confidential informants. Roubison, a drug user, said she was trying to clean up her life and that she wanted to help the Sheriff's department catch drug dealers. On June 29, 2007, Roubison met Thomas and Lawrence Police Officer Justin Rhoades at the Investigations and Training Center (ITC) in Lawrence. At the meeting, Roubison told the officers about her relationship with a man called "Big J." Roubison indicated she had purchased drugs from "Big J." in the past, and she had a phone number to contact him. Rhoades was aware that Waldrup was known as "Big J.," so he showed Roubison a picture of Waldrup and she identified him as "Big J."

That same day, Roubison signed a "Cooperating Individual Agreement" that stated, in part, that in consideration for her cooperation with law enforcement, she might receive compensation or reimbursement. Thomas later testified that Roubison received certain benefits from the DEU in exchange for her cooperation, including $60 to have Roubison's car towed after her tires were slashed, $38.18 toward new tires, and $10.73 in cell phone charges. Also, Thomas talked to the Lawrence city prosecutor about an outstanding municipal warrant on Roubison, which Thomas believed was later dismissed.

On July 6, 2007, at around 2 p.m., Roubison met with Thomas at the ITC. Lawrence Police Detective Amy Price searched Roubison to ensure she did not have any drugs or money in her possession. Thomas attached a recording device to Roubison's cell phone, and Roubison also wore a recording device on her body. Roubison called Waldrup on her cell phone and arranged to meet him that day at the Fast Lane gas station in Lawrence to buy crack cocaine. Thomas, acting as an undercover officer, accompanied Roubison

to the arranged sale. When Thomas and Roubison arrived at the gas station, Waldrup was waiting in the passenger seat of a car driven by an unknown female. Roubison got into the car with Waldrup, where she remained for approximately 30 seconds. She then came back to Thomas' car, handed Thomas a packet of crack cocaine, and she and Thomas drove back to the ITC. Thomas placed the cocaine in a padlocked storage locker, and Price again searched Roubison to make sure she did not have any other drugs or money.

Later that same day, Roubison called Waldrup a second time, arranging to meet him to purchase more cocaine. The parties ultimately agreed to meet at the Pool Room in Lawrence. Thomas and Waldrup drove to the Pool Room and within a few minutes of their arrival, Waldrup arrived in a car driven by a female later identified as Stephanie Jones. Roubison and Thomas walked over to the other car, where Thomas talked to Jones while Roubison spoke with Waldrup. Thomas heard Waldrup tell Roubison that he did not have a container in which to place the cocaine, so Roubison went back to Thomas' car and removed the cellophane from a package of cigarettes. Roubison handed the cellophane and the money to Thomas, who handed it all to Waldrup. Waldrup took the money, put the drugs in the cellophane, and gave the drugs to Thomas. Roubison and Thomas then returned to the ITC, and Thomas put the drugs into a storage locker.

Waldrup was arrested October 26, 2007, on charges filed in case 2007 CR 1552. That case was subsequently dismissed without prejudice. On January 23, 2008, the State filed an information in case 2008 CR 107 charging Waldrup with one count of selling, delivering, or distributing cocaine within 1000 feet of school property; one count of possession of cocaine; and two counts of unlawfully arranging sales or purchases of controlled substances using a communication facility. The Douglas County District Court issued a warrant for Waldrup's arrest on January 28, 2008.

Meanwhile, on January 14, 2008, Waldrup waived extradition to Missouri to face charges there. On September 9, 2008, a jury in Missouri convicted Waldrup of possession of a controlled substance, and Waldrup was sentenced to 12 years' imprisonment.

Waldrup was returned to Kansas to address his charges here on April 9, 2009.

The State filed amended informations, ultimately charging Waldrup with two counts of selling, delivering, or distributing cocaine, third offense, and two counts of unlawfully arranging sales or purchases of controlled substances using a communication facility. The case was scheduled for jury trial on September 23, 2009, but that proceeding ended in a mistrial. The State subsequently dismissed the two counts of unlawfully arranging sales or purchases of controlled substances using a communication facility.

The jury trial commenced October 28, 2009. Roubison and Thomas testified for the State about the two cocaine purchases on July 6, 2007. The audio recordings of both sales were played for the jury. Jones also testified for the State and confirmed the drug sale at the Pool Room. Waldrup did not testify, but he called one witness who testified that the cell phone number Roubison had given Thomas was not Waldrup's cell phone number. After hearing the evidence, the jury convicted Waldrup of two counts of sale of cocaine. On November 30, 2009, the district court sentenced Waldrup to a controlling term of 162 months' imprisonment, based on Waldrup's prior convictions, to run consecutive to the Missouri sentence. Waldrup timely appealed his convictions.

## ALTERNATIVE MEANS TO COMMIT SALE OF COCAINE

Waldrup first argues that sale of cocaine is an alternative means crime and the State failed to present sufficient evidence of each alternative means of committing the crime. Our Supreme Court has stated:

" ' "In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means. [Citations omitted.] In reviewing an alternative means case, the court must determine whether a rational trier of fact *could* have found each means of committing the crime proved beyond a reasonable doubt. [Citations omitted.]" ' [Citation omitted.]" *State v. Wright*, 290 Kan. 194, 202, 224 P.3d 1159 (2010).

Before we address whether there was sufficient evidence to prove the alternative means, however, we must determine whether

this case truly presents an issue of alternative means. If the offense with which Waldrup was charged and convicted, sale of cocaine, cannot be committed in more than one way, jury unanimity is not at issue and alternative means analysis is inapplicable. The issue involves statutory interpretation. Interpretation of a statute is a question of law over which an appellate court has unlimited review. *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010).

The statute under which Waldrup was charged, K.S.A. 2006 Supp. 65-4161(a), makes it unlawful to "sell, offer for sale or have in such person's possession with intent to sell, deliver or distribute; prescribe; administer; deliver; distribute; or dispense any opiates, opium or narcotic drugs, or any stimulant designated in subsection (d)(1), (d)(3) or (f)(1) of K.S.A. 65-4107 and amendments thereto." The State acknowledges that this statute contains alternative means of committing the crime. However, the jury did not have the option to convict Waldrup of multiple alternative means under K.S.A. 2006 Supp. 65-4161. At trial, the district court gave the jury the following instruction:

"To establish this charge [of unlawfully selling cocaine], each of the following claims must be proved:
"1. That the defendant sold cocaine;
"2. That the defendant did so intentionally; and
"3. That this act occurred on or about the 6th day of July, 2007, in Douglas County, Kansas."

The instruction gave the jury the option of convicting Waldrup only of the *sale* of cocaine, as opposed to other alternative means under the statute. Therefore, there was jury unanimity on the issue of Waldrup's guilt of sale of cocaine as to the elements of the crime. Courts have generally looked to the statutory language of the crime to determine whether a statute creates alternative means for committing a crime. See, *e.g.*, *Wright*, 290 Kan. at 206-07 (finding the alternative means for committing rape after an examination of the statutory language); *State v. Quinones*, 42 Kan. App. 2d 48, 54, 208 P.3d 335 (2009), *rev. denied* 290 Kan. 1101 (2010) (finding that "the plain language" of the statute in question provided the crime might be committed by alternative means).

However, Waldrup's alternative means argument goes beyond the statutory language of K.S.A. 2006 Supp. 65-4161. Here, the district court gave the jury a separate instruction on the definition of "sale" that stated, in part: "A sale under the Uniform Controlled Substances Act has a broader meaning than 'sale' usually has. Sale under the Act means selling for money, and also includes barter, exchange, or gift, or an offer to do any of these things." Waldrup asserts that the phrase "barter, exchange, or gift, or an offer to do any of these things" in this definitional jury instruction created alternative means of committing the unlawful sale of cocaine. Because the State did not provide evidence that Waldrup bartered for, made an exchange for, or gifted the cocaine to either Roubison or Thomas in either transaction, Waldrup argues that his convictions must be vacated.

The State first characterizes Waldrup's argument as a challenge to the jury instruction defining "sale" and argues that because the instruction is a fair, proper, and long-approved statement of the law, there was no error in giving the instruction. This argument misses the point, however, as Waldrup is not challenging the giving of the jury instruction. Waldrup is presenting an alternative means argument based on the definitional instruction of the term "sale," and he is arguing there was insufficient evidence presented at trial to find him guilty beyond a reasonable doubt of each alternative means of committing the crime. As to Waldrup's argument that the definitional instruction creates an alternative means issue, the State asserts that looking beyond the strict elements of the crime set forth in K.S.A. 2006 Supp. 65-4161(a) is inappropriate.

Whether a definitional jury instruction can create alternative means of committing a crime is an issue of first impression in Kansas. In *State v. Aguirre*, 45 Kan. App. 2d 141, 245 P.3d 1 (2011), *aff'd in part, rev'd in part* 296 Kan. 99, 290 P.3d 612 (2012), the defendant was charged with aggravated intimidation of a victim. At trial, the district court instructed the jury on the elements of the crime, including the element that the defendant acted knowingly and maliciously. The district court also provided the jury with the statutory definition of the term "maliciously" as follows: " 'As used in this instruction, maliciously means with an intent to vex, annoy,

harm or injure in any way another person, or with an intent to thwart or interfere in any manner with the orderly administration of justice.' " 45 Kan. App. 2d at 147. Among other issues on appeal, the defendant raised an alternative means challenge based on the definition of the term "maliciously," contending that aggravated intimidation of a victim can be committed either (1) by acting with the intent to vex, annoy, harm, or injure the victim or (2) by acting with the intent to thwart or interfere with the orderly administration of justice. This court did not squarely address the issue and ultimately determined that "[e]ven if we were to consider the description of malice in the statute as describing alternative means of committing the crime, there was substantial evidence to support both alternative means." 45 Kan. App. 2d at 150.

Although there is no Kansas case directly on point, the Supreme Court of Washington addressed whether definitional jury instructions can create alternative means of committing a crime in *State v. Smith*, 159 Wash. 2d 778, 154 P.3d 873 (2007). It is important to note that current alternative means analysis in Kansas is largely based on that of Washington. See *State v. Timley*, 255 Kan. 286, 289, 875 P.2d 242 (1994) (quoting *State v. Kitchen*, 110 Wash. 2d 403, 410, 756 P.2d 105 [1988]). In *Smith*, the defendant was charged with three counts of first-degree assault with a firearm. At the close of the evidence, the jury was instructed on the crime of assault in the first degree and the lesser included offense of second-degree assault. The jury was also given a separate instruction that set forth the common-law definitions of assault as follows:

" 'An assault is an intentional touching, striking, cutting, or shooting of another person, with unlawful force, that is harmful or offensive regardless of whether any physical injury is done to the person. A touching, striking, cutting, or shooting is offensive, if the touching, striking, cutting, or shooting would offend an ordinary person who is not unduly sensitive.

" 'An assault is also an act, with unlawful force, done with the intent to inflict bodily injury upon another, tending, but failing to accomplish it and accompanied with the apparent present ability to inflict the bodily injury if not prevented. It is not necessary that bodily injury be inflicted.

" 'An assault is also an act, with unlawful force, done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even

though the actor did not actually intend to inflict bodily injury.' [Citation omitted.]" 159 Wash. 2d at 781-82.

The jury convicted the defendant of three counts of second-degree assault with a deadly weapon. The defendant appealed her convictions, claiming the State failed to present substantial evidence as to each definition of assault for each victim and, thus, her constitutional right to jury unanimity was compromised. Division Two of the Washington Court of Appeals affirmed, "holding that the common law assault definitions do not create alternative means of commission," and the defendant petitioned for review by the Washington Supreme Court. 159 Wash. 2d at 782-83.

The Washington Supreme Court repeated its alternative means test, which is the same as Kansas', requiring that "substantial evidence of each of the relied-on alternative means must be presented." 159 Wash. 2d at 783; see also *Wright*, 290 Kan. at 202 (quoting *Timley*, 255 Kan. at 289). The court identified the two underlying purposes of the alternative means doctrine, which are

"to prevent jury confusion about what criminal conduct has to be proved beyond a reasonable doubt and to prevent the State from charging every available means authorized under a single criminal statute, lumping them together, and then leaving it to the jury to pick freely among the various means in order to obtain a unanimous verdict. [Citations omitted.]" 159 Wash. 2d at 789.

The court framed the defendant's issue as "whether the common law definitions of assault, when submitted to a jury in a single and separate definitional instruction, constitute alternative means of committing the crime of assault in whichever degree charged." 159 Wash. 2d at 783-84. The *Smith* court determined the answer was no, relying in large part on a long line of Washington cases holding that alternative means analysis should not be extended to include definitional jury instructions. 159 Wash. 2d at 785. Rather, the court stated that definitional instructions "merely elaborate on and clarify" the terms used in the statutes that define the crimes. 159 Wash. 2d at 786. The court stated the definitions merely served to define an element of the crime charged and "thereby give rise to a 'means within a means' scenario" which "does not trigger jury unanimity protections." 159 Wash. 2d at 787; see *State v. Linehan*,

147 Wash. 2d 638, 646-51, 56 P.3d 542 (2002) (providing a thorough discussion of the " 'means within a means' scenario" which does not trigger alternative means analysis under Washington law).

*Smith* was a five-four decision. The *Smith* majority emphasized the fact that the jury instruction in question set forth the "three *common law* definitions of assault." (Emphasis added.) 159 Wash. 2d at 780. Throughout the opinion, the majority referred to the jury instructions as "common law definitions," even framing the issue as narrowly as "whether the common law definitions of assault . . . constitute alternative means of committing the crime of assault in whichever degree charged." 159 Wash. 2d at 783-84. The majority stated that it limited the alternative means doctrine to those means provided by the assault statutes in the absence of legislative intent to the contrary. 159 Wash. 2d at 789-90.

Because the *Smith* majority emphasized that the definitions of assault were based on common-law definitions, we will examine the source of the district court's definitional instruction of the term "sale" provided to Waldrup's jury. The definition given by the district court was from PIK Crim. 3d 67.13-A, which stated, in part, that "[a] sale under the Uniform Controlled Substances Act has a broader meaning than 'sale' usually has. Sale under the Act means selling for money, and also includes barter, exchange, or gift, or an offer to do any of these things." The Notes on Use indicate that the definition is for crimes committed prior to July 1, 2009, which includes Waldrup's case. The PIK manual cites *State v. Nix*, 215 Kan. 880, 882, 529 P.2d 147 (1974), as authority for the instruction.

It appears from a reading of *Nix* that the definition of "sale" used in the PIK instruction came from the Uniform Narcotic Drug Act, which defined "sale" as including "barter, exchange, or gift, or offer therefor, and each such transaction made by any person, whether as principal, proprietor, agent, servant, or employee. [Citations omitted.]" 215 Kan. at 882. However, the Uniform Narcotic Drug Act was repealed in 1972, and the Uniform Controlled Substances Act, K.S.A. 65-4101 *et seq.*, was enacted, which did not define "sale." 215 Kan. at 882. The *Nix* court, after recognizing that the Uniform Narcotic Drug Act, including the definition of

"sale" included therein, had been repealed, stated that it was "not constrained to restrict the definition." 215 Kan. at 882.

In *State v. Evans*, 219 Kan. 515, 518, 548 P.2d 772 (1976), our Supreme Court again approved the use of the former statutory definition, even though it was no longer part of a valid statute; see also *State v. Griffin*, 221 Kan. 83, 84, 558 P.2d 90 (1976) (approving the definition of "sale" based on prior case law). The Uniform Controlled Substances Act was never amended to include a statutory definition of the term "sale," and this is the Act under which Waldrup was prosecuted. In 2009, the legislature moved the Uniform Controlled Substances Act to Chapter 21 of the Kansas Statutes Annotated. See K.S.A. 2010 Supp. 21-36a01 through 21-36a17, which are applicable to crimes committed after July 1, 2009. The new statutes do not define the term "sale," but the new statutes contain a definition of the term "distribute" which incorporates the term "sale." K.S.A. 2010 Supp. 21-36a01(d). Therefore, at the time Waldrup was prosecuted, there was no codified definition of the term "sale." The definition used in the instruction at issue was based on a statutory definition that was part of a repealed statute and was subsequently approved and adopted by our Supreme Court.

The dissent in *Smith* agreed with the defendant that the "common law assault definitions are alternative means of committing the crime of assault."159 Wash. 2d at 795 (Bridge, J., dissenting). According to the dissent, the *Smith* majority disregarded the distinction between "definitions of *terms* (which do not create alternate means of committing an offense)" and "definitions of the *crime* (which do)." 159 Wash. 2d at 793. The dissent stated:

" '[D]efinition statutes do not create additional alternative means of committing an offense.' *State v. Linehan*, 147 Wash. 2d 638, 646, 56 P.3d 542 (2002). Like a means within a means, definitions within definitions merely 'elaborate upon various terms or words' within a crime. [Citation omitted.] But we also recognize that statutes *defining* a crime *do* provide alternative means of committing theft. [Citation omitted.]" 159 Wash. 2d at 794 n.10.

The dissent advocated an analytical distinction between " 'fundamental definitions,' " which are "those where the definition *is* the crime," and " 'explanatory definitions,' " which are "those

where the definition clarifies terminology or an element of the crime." 159 Wash. 2d at 794. Under the dissent's framework, fundamental definitions may create alternative means to commit a crime, but explanatory definitions do not. 159 Wash. 2d at 794. The dissent stated that, in this analysis, the common-law definitions of assault are fundamental definitions because "their purpose goes beyond merely providing detail for the elements of the assault." 159 Wash. 2d at 795. Rather, according to the dissent, the common-law definitions of assault "identify the very act of assault and do so in alternative ways." 159 Wash. 2d at 795.

We find the reasoning of both the *Smith* majority and the dissent to be persuasive. Waldrup asks this court to extend alternative means analysis to include definitional instructions and to hold that the definitional instruction of the term "sale" created alternative means of committing the crime of sale of cocaine. As the *Smith* majority noted, such an application of the alternative means doctrine would frustrate the underlying purposes of the doctrine. 159 Wash. 2d at 788. Here, the broad definition of the term "sale" did not reasonably confuse the jury about what criminal conduct the State had to prove in order to find Waldrup guilty of sale of cocaine. Likewise, the State did not charge Waldrup with every available means authorized under the statute, lump them together, and then leave it to the jury to pick freely among the various means in order to obtain a unanimous verdict. See 159 Wash. 2d at 789. As to the *Smith* majority's emphasis on the common-law definition of assault, we note there was no codified definition of "sale" at the time Waldrup was prosecuted, and the definitional instruction provided to the jury by the district court was approved by Kansas case law. See *Griffin*, 221 Kan. at 84.

On the other hand, the *Smith* dissent makes a valid argument on the analytical distinction between "fundamental definitions" and "explanatory definitions." In *Smith*, the defendant was charged with assault with a firearm and the district court provided a definition of "assault," which constituted the crime itself. When such a fundamental definition includes alternative means of committing the crime, then each alternative means must be supported by substantial evidence to uphold a conviction. As another example, if a

defendant is charged with criminal sodomy and the district court provides the jury with a definition of "sodomy" that includes alternative means of committing the crime, then each alternative means must be supported by substantial evidence to uphold the defendant's conviction of criminal sodomy.

However, in Waldrup's case, the district court's definition of the term "sale" would be more aptly categorized as an explanatory definition rather than a fundamental definition of the crime itself. The definition clarifies terminology or an element of the crime. Even under the framework of the *Smith* dissent, the district court's definition of the term "sale" did not create alternative means to commit a crime. Relying on the reasoning of *Smith*, we hold that the district court's definitional jury instruction of the term "sale" did not create alternative means of committing the crime of sale of cocaine. Accordingly, we conclude jury unanimity was not at issue and Waldrup's convictions were supported by sufficient evidence.

### Speedy Trial under the Agreement on Detainers

Next, Waldrup argues that the State violated his speedy trial rights under the Agreement on Detainers (Agreement), K.S.A. 22-4401 *et seq*. Waldrup makes two separate arguments. First, Waldrup argues that the State violated his speedy trial rights under Article IV of the Agreement when it failed to bring him to trial within 120 days of his arrival in Kansas. Second, Waldrup argues that the State violated his speedy trial rights under Article III of the Agreement when it failed to bring him to trial within 180 days of his notice and request for final disposition. These issues require statutory interpretation. Interpretation of a statute is a question of law over which an appellate court has unlimited review. *Arnett*, 290 Kan. at 47.

The statutory right to a speedy trial of an inmate who is confined in a penal or correctional institution *in this state* excluding a federal penitentiary is governed by the Uniform Mandatory Disposition of Detainers Act (UMDDA), K.S.A. 22-4301 *et seq*. The statutory right to a speedy trial of an inmate who is confined in a penal or correctional institution *in another state* or in a federal penitentiary

is governed by the Agreement. *State v. Dolack*, 216 Kan. 622, 633-34, 533 P.2d 1282 (1975). There are two distinct speedy trial deadlines in the Agreement, depending on who initiates the prisoner's return to the jurisdiction with pending charges.

"The 180-day speedy trial provision contained in Article III . . . is controlling where a prisoner incarcerated in a state penal institution requests disposition of the charges pending against him in another state. The 120-day provision contained in Article IV of the Agreement controls where the prisoner is returned for prosecution upon the request of the prosecuting authorities in the state which filed the detainer against the prisoner." *State v. White*, 234 Kan. 340, Syl. ¶ 1, 673 P.2d 1106 (1983).

Initially, the State argues that Article IV is inapplicable because it never submitted a request for Waldrup's return to Kansas under the Agreement. There is evidence in the record that supports the State's claim. The district court file contains an "Agreement on Detainers: Form II" signed by Waldrup and filed on March 11, 2009, wherein Waldrup requested his return from the Western Reception and Diagnostic Correctional Center in Missouri for disposition of the charges pending against him in Kansas. Also, at the arraignment hearing, the prosecutor advised the district court that the State had not initiated Waldrup's return to Kansas.

On the other hand, Waldrup asserts that the State filed a request for custody under the Agreement on December 12, 2008. To support this statement, Waldrup cites to a form titled "Agreement on Detainers: Form IV," included in the record on appeal, which is an offer to deliver temporary custody signed by the warden of the Missouri facility and addressed to the district attorney of Douglas County, Kansas. The form states, in part:

"Pursuant to the provisions of Article V of the Agreement on Detainers between this state and your state, the undersigned hereby offers to delivery [*sic*] temporary custody of the above-named prisoner to the appropriate authority in your state in order that speedy and efficient prosecution may be had of the indictment, information or complaint which is . . . *described in your request for custody dated 12-12-2008.*" (Emphasis added.)

The State asserts in its brief that "[t]he district court found that the request for defendant's return on detainer was initiated by the defendant and thus the 180 days [*sic*] period provided in Article

III of the Interstate Agreement on Detainers governed the timeliness of this case." However, the record on appeal is not as clear as the State asserts. Rather, at a motions hearing, the district judge discussed with counsel the appropriate date on which to begin calculation of the speedy trial time period. At a subsequent hearing, the district judge announced her decision, "I started with issue one, the violation of the speedy trial, whether or not we violated the speedy trial pursuant to the agreement on detainers, and I don't believe there has been a violation. It's governed by K.S.A. 22-4401, Article III." The district judge then went through the analysis under Article III.

It appears the district court presumed that the 180-day speedy trial provision contained in Article III of the Agreement was controlling in Waldrup's case. But the record on appeal contains conflicting evidence which was never clearly resolved by the district court. Accordingly, we will address Waldrup's speedy trial rights under both Article III and Article IV of the Agreement.

K.S.A. 22-4401, Article III(a) states:

"Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred eighty (180) days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint: *Provided*, That for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance."

Under the Agreement, any continuance granted for good cause shown in open court extends the 180-day time limitation for bringing the defendant to trial, provided the prisoner or his or her counsel is present. Although the granting of a continuance is generally within a district court's discretion, "when a constitutional or statutory right is involved, that discretion is limited and 'there is a greater need for the trial judge to articulate the reasons for any discretionary decision.' [Citation omitted.]" *State v. Burns*, 44 Kan. App. 2d 289, 292, 238 P.3d 288 (2010).

Under Article III, the speedy trial clock begins to run when the notice and request for disposition are received by the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction. *White*, 234 Kan. at 344-45. Waldrup's notice and request were filed on March 11, 2009, and the parties agree that this date controls the Article III analysis. Waldrup's trial began September 23, 2009, 196 days after his notice was received. Although this trial ended in a mistrial, our Supreme Court has held that, under Article III, the phrase "brought to trial" means only that a proceeding must be initiated, not that the case be finally disposed of within the speedy trial deadline. *White*, 234 Kan. at 345.

Because of the time expansion provisions in Article III of the Agreement, and because Waldrup's trial began 196 days after his notice was received, if 16 days are attributable to permissible continuances, granted for good cause shown in open court with Waldrup or his counsel present, there is no violation of Article III. Furthermore, it does not matter whether the continuance was requested by the State or by the defendant as long as good cause was shown in open court with Waldrup or his counsel present. See *State v. Watson*, 39 Kan. App. 2d 923, 928, 186 P.3d 812, *rev. denied* 287 Kan. 769 (2008) (holding that under the UMDDA, which contains language similar to the Agreement, any continuance for good cause shown, whether requested by the State or by the defendant, extends the time limitation for bringing the defendant to trial).

The district court granted four continuances in Waldrup's case between March 11, 2009, and September 23, 2009. We will examine the record to determine whether each of these continuances was granted for good cause. On April 28, 2009, the parties appeared before the district court for a preliminary hearing. Waldrup was represented by counsel and was personally present at the hearing. The State requested a continuance of the preliminary hearing because Thomas was recovering from knee surgery and could not attend and testify. Waldrup objected to the continuance and asserted his right to a speedy trial under the Agreement. The district judge stated:

"Well, I don't have any reason to believe the State or Deputy Thomas is lying about the fact that he is having knee surgery and it is not unusual for people to have multiple knee surgeries, so I find that the State has shown good cause for this continuance. I will note the defendant's objection to this continuance in my docket notes, but I am going to grant that continuance."

The preliminary hearing was then rescheduled for May 11, 2009. Although Waldrup now summarily argues that "[t]he State did not make this request under the 'good cause' standard of [the Agreement]," the district court explicitly found on the record that there was good cause for the continuance, and Waldrup did not object to that finding. Moreover, the continuance was granted in open court with both Waldrup and his counsel present. Therefore, the 13 days from April 28 to May 11 do not count toward the 180-day time limit under Article III of the Agreement.

On May 11, 2009, at the rescheduled preliminary hearing, Waldrup's attorney requested a continuance in order to have time to review the amended information and go over certain discovery with Waldrup. The continuance request was due, in part, to the attorney's vacation the prior week. The State objected to the continuance, but the district judge rescheduled the hearing to May 26, 2009, and stated, "I do think Mr. Waldrup needs an opportunity to review the discovery with his attorney before we have the preliminary hearing, so let's continue this." The 15-day delay from May 11 to May 26 was requested in open court, by Waldrup's attorney, at a hearing at which Waldrup was present. Although the district judge did not use the phrase "good cause" in granting the continuance, this finding is implicit in the district court's ruling. Thus, this continuance expands the time limitation under Article III an additional 15 days.

On July 24, 2009, the parties appeared before the district court for a status conference; the trial was scheduled to begin July 29, 2009. The State requested a continuance of the trial because the KBI chemist who tested the substance was unavailable to testify on the scheduled trial date. The district court granted the trial continuance to August 27, 2009. On appeal, Waldrup does not argue this continuance was not for good cause; rather, he argues the continuance should not be charged to Waldrup because it was

requested by the State. However, Article III does not differentiate continuances based upon which party requested the delay. Rather, the time limitation is expanded when, "for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter . . . grant[s] any necessary or reasonable continuance." K.S.A. 22-4401, Article III(a). Although the district judge did not use the phrase "good cause" in granting the continuance, in a later hearing at which the district judge announced her ruling on Waldrup's speedy trial issue, the district judge stated "in every case, the State showed good cause for the requested continuance." Thus, because the continuance was granted for good cause shown in open court with both Waldrup and his counsel present, the 29-day continuance between July 29 and August 27 does not count toward the 180-day time limit under Article III of the Agreement.

Finally, on August 27, 2009, on the morning of the scheduled trial, the State provided information to Waldrup from Roubison's file. The information showed the DEA had reimbursed Roubison for some items and also included a five-page narrative from Rhoades after his interview with Roubison. Waldrup's attorney clearly stated she was not asking for a continuance, but she argued the case should be dismissed because Waldrup's due process rights had been violated due to the late discovery. After hearing argument from counsel, the district court found that the late discovery was "not a bad faith situation" on the part of the State. The district court refused to dismiss the case, but the court continued the trial to September 23, 2009, to allow defense counsel the opportunity to review the late discovery. The district court made no finding whether the continuance was for good cause. It appears from the record that the final trial continuance was necessitated solely because of late discovery provided by the State on the morning of the scheduled trial. We are unable to conclude from the record on appeal that the final continuance by the district court was granted for good cause so as to extend 180-day limitation under Article III of the Agreement.

To summarize the analysis under Article III of the Agreement, the first three continuances, totaling 57 days, were granted for good

cause shown in open court with either Waldrup or his counsel being present. When these continuances are subtracted from the 196 days it took to bring Waldrup to trial, the time left is 139 days, which is below the 180-day limitation imposed by Article III. Therefore, there was no violation of Waldrup's right to a speedy trial under Article III of the Agreement.

Turning to Article IV of the Agreement, K.S.A. 22-4401, Article IV(a) states:

"The appropriate officer of the jurisdiction in which an untried indictment, information or complaint is pending shall be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party state made available in accordance with article V(a) hereof upon presentation of a written request for temporary custody or availability to the appropriate authorities of the state in which the prisoner is incarcerated: *Provided*, That the court having jurisdiction of such indictment, information or complaint shall have duly approved, recorded and transmitted the request: *And provided further*, That there shall be a period of thirty (30) days after receipt by the appropriate authorities before the request be honored, within which period the governor of the sending state may disapprove the request for temporary custody or availability, either upon his own motion or upon motion of the prisoner."

K.S.A. 22-4401, Article IV(d) provides:

"In respect of any proceeding made possible by this article, trial shall be commenced within 120 days of the arrival of the prisoner in the receiving state, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance."

Here, the alleged Article IV request by Kansas was made on December 12, 2008. Waldrup was returned to Kansas on April 9, 2009, and the parties agree that this date controls the Article IV analysis. From April 9, 2009, to September 23, 2009, is 167 days, beyond the 120-day limitation to bring Waldrup to trial under Article IV of the Agreement. However, we have already determined that the first three continuances by the district court, totaling 57 days, were granted for good cause shown in open court with either Waldrup or his counsel being present. When these continuances are subtracted from the 167 days it took to bring Waldrup to trial, the time left is 110 days, which is below the 120-day limitation imposed by Article IV of the Agreement. Thus, there was no vio-

lation of Waldrup's right to a speedy trial under Article IV of the Agreement, even if Article IV is considered to be applicable. We conclude the State did not violate Waldrup's speedy trial rights under the Agreement.

### CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL

Next, Waldrup contends the State violated his constitutional right to a speedy trial as guaranteed by the Sixth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. Waldrup raised this issue before the district court, and the district court held a hearing, after which it found that Waldrup's constitutional right to a speedy trial was not violated. Whether a defendant's constitutional right to a speedy trial has been violated is a question of law over which an appellate court has unlimited review. *State v. Hayden*, 281 Kan. 112, 126-27, 130 P.3d 24 (2006).

Initially, the State argues that because it complied with the speedy trial dictates of the Agreement, there can be no violation of Waldrup's constitutional right to a speedy trial. To support this contention, the State cites *Townsend v. State*, 215 Kan. 485, 524 P.2d 758 (1974). In *Townsend*, which involved a proceeding under the UMDDA, the defendant argued that the State had failed to comply with that part of K.S.A. 62-2901 (Corrick) (now K.S.A. 22-4301) which provides that if the inmate's request for speedy trial is properly served and filed, the inmate must be brought to trial within 180 days of the request. The court noted the flaw in the defendant's argument was that he had failed to comply with the provisions of the detainer act by filing his speedy trial request both with the court and with the county attorney. 215 Kan. at 486.

The court in *Townsend* also addressed whether "the trial court should have held a hearing on a general claim of a denial of his constitutional right to a speedy trial." 215 Kan. at 487. In rejecting this argument, the court discussed the general speedy trial statutes found in K.S.A. 62-1431 (Corrick) and K.S.A. 62-1432 (Corrick), which were replaced in 1970 by what is now K.S.A. 22-3402. The court indicated that as to inmates of a penal institution, the general speedy trial statutes were inapplicable and an inmate's rights were

governed solely by the UMDDA. 215 Kan. at 487. In addition, the court stated:

"[The appellant] had a constitutional right to a speedy trial, but that right was defined in the detainer's act. He concedes as much. That act provides a simple, efficacious method for an inmate to secure a speedy trial, and where he complies this court has not hesitated to grant relief. See *State v. Goetz*, [187 Kan. 117], where the accused was discharged when his trial began just three days after the statutory 180. . . . [Citation omitted.] Here, appellant also concedes that the authorities complied with the act. By the latter concession he necessarily agrees that he was not denied his constitutional right to a speedy trial." 215 Kan. at 488.

In *Dolack*, 216 Kan. at 633, our Supreme Court cited *Townsend* for the proposition that "[i]t is a well-established rule the Legislature may, within reason, define what is meant by the constitutional guarantee to a speedy trial, and has consistently done so. [Citation omitted.]" Moreover, in *State v. Angelo*, 287 Kan. 262, 270, 197 P.3d 337 (2008), a case involving an inmate's speedy trial rights under the Agreement, the court repeated the language from *Townsend* that " '[the defendant] had a constitutional right to a speedy trial, but that right was defined in the detainer's act.' " However, the only issue in *Angelo* was whether the defendant's speedy trial rights were governed by the detainer acts as opposed to the general speedy trial statute at K.S.A. 22-3402. The defendant in *Angelo* did not even attempt to raise a constitutional speedy trial claim in addition to a statutory claim under the detainer acts. Thus, *Angelo* does not support the State's position that because it complied with the speedy trial dictates of the Agreement, there can be no violation of Waldrup's constitutional right to a speedy trial.

In *Barker v. Wingo*, 407 U.S. 514, 523, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), the United States Supreme Court recognized that a criminal defendant has a constitutional right to a speedy trial that is separate and distinct from any statutory right provided by a state legislature. Although *Barker* was decided 2 years before the Kansas Supreme Court's decision in *Townsend*, the court's decision in *Townsend* did not address *Barker*. However, the Kansas Supreme Court has a long tradition of considering constitutional speedy trial claims even when no statutory speedy trial right has been violated. See, *e.g.*, *State v. Smallwood*, 264 Kan. 69, 75-76,

955 P.2d 1209 (1998); *State v. Mathenia*, 262 Kan. 890, 894-900, 942 P.2d 624 (1997); *State v. Fitch*, 249 Kan. 562, 563, 819 P.2d 1225 (1991).

Furthermore, in *State v. Vaughn*, 254 Kan. 191, Syl. ¶ 1, 865 P.2d 207 (1993), our Supreme Court recognized that an inmate's failure to comply with the provisions of the Agreement was not dispositive of the inmate's constitutional right to a speedy trial. In *Vaughn*, an inmate's motion to dismiss for violation of his right to a speedy trial was denied because the district court found the inmate had not sought a timely disposition of the detainer filed against him in the manner prescribed by statute. On appeal, without discussing *Townsend*, our Supreme Court stated that the trial court erred in finding this was the only manner by which the inmate could invoke the right to a speedy trial. The court stated: "A defendant's constitutional right to a speedy trial exists notwithstanding his or her lack of compliance with the Interstate Agreement on Detainers." 254 Kan. at 195. The court also explained:

> " 'It is a well-established rule that the Legislature may, within reason, define what is meant by the constitutional guarantee of a speedy trial.' [Citation omitted.] This the legislature did in enacting the Interstate Agreement on Detainers Act. *That does not end the discussion of the issue, however. Cf. Barker*, 407 U.S. at 523-24, 528 . . . . *Analysis of the defendant's right to a speedy trial under the Constitution is appropriate despite his failure to comply with the Agreement, and his failure to request a trial pursuant to the Interstate Agreement on Detainers is a factor in the balancing test.*" (Emphasis added.) 254 Kan. at 195.

The Kansas Supreme Court's decision in *Vaughn* is at odds with the language in *Townsend* that an inmate's constitutional right to a speedy trial is defined in the detainer acts. Under the rationale of *Vaughn*, if an inmate's failure to comply with the provisions of the Agreement does not preclude analysis of the inmate's constitutional right to a speedy trial, neither should the State's compliance with the provisions of the Agreement preclude such an analysis. Because of the court's decision in *Vaughn*, we are reluctant to rely on *Townsend*, as the State wants us to do, to conclude that Waldrup is foreclosed from claiming a violation of his constitutional right to a speedy trial. Accordingly, we will address Waldrup's constitutional claim.

" 'The constitutional protection of a speedy trial attaches when one becomes accused and the criminal prosecution begins, usually by either an indictment, an information, or an arrest, whichever first occurs.' [Citations omitted.]" *State v. Rivera*, 277 Kan. 109, 112, 83 P.3d 169 (2004). Waldrup argues that October 26, 2007, is the date he was initially charged and arrested for the events of July 6, 2007. The State and defense counsel agreed to this date in district court while presumably looking at documents from the 2007 case file, but the 2007 case file is not included in the record on appeal. In *Barker*, 407 U.S. at 530, the United States Supreme Court listed four factors courts should consider when determining whether the state or federal government violated a defendant's constitutional right to a speedy trial. These factors are: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his or her right, and (4) prejudice to the defendant. 407 U.S. at 530. None of the factors is controlling; rather, the factors must be considered together with any other relevant circumstances. "In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." 407 U.S. at 533. We will address each of these factors as they apply to Waldrup's case.

*Length of delay*

The first factor is the length of the delay between the triggering event and the trial. "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." 407 U.S. at 530. The parties agree that October 26, 2007, started the speedy trial clock for purposes of constitutional analysis. Therefore, the time before Waldrup's trial, which commenced on September 23, 2009, was 698 days, or approximately 23 months.

Our Supreme Court has resisted setting rigid rules for what length of time is presumptively prejudicial, preferring to examine each delay in the context of the facts in that particular case. See *State v. Weaver*, 276 Kan. 504, 509, 78 P.3d 397 (2003) (" '[T]he delay in each case is analyzed according to its particular circum-

stances.' [Citation omitted.]"). Moreover, the "tolerable delay for an ordinary crime is less than for a complex one. [Citation omitted.]" 276 Kan. at 511. A sale of cocaine based on facts such as these is not a complex crime; the State had multiple eyewitnesses to the drug buys, including an undercover deputy sheriff; the State had multiple audio recordings of the transactions; and the State had the crack cocaine purchased from Waldrup, once by Thomas himself. Therefore, 23 months is a presumptively prejudicial length of time, and we will consider the additional *Barker* factors. See *Weaver*, 276 Kan. at 511 (finding presumptively prejudicial a delay 15 months, including 299 days "in which no attempt was made to try the defendant" for possession of cocaine with intent to sell).

*Reason for the delay*

The second Barker factor is the reason for the delay. 407 U.S. at 530. Waldrup's brief offers no support that the reason for the delay weighs in favor of his claim of a constitutional speedy trial violation. In district court, Waldrup pointed only to an allegation that the State delayed the preliminary hearing three times because of Thomas' knee injury. As stated above, there is nothing in the record from the 2007 case to support Waldrup's claim about any delays in the 2007 case. The burden is on the appellant to designate a record to support a claim of error at the trial court. Without such a record, the claim of alleged error fails. *State v. Paul*, 285 Kan. 658, 670, 175 P.3d 840 (2008).

In any event, it appears from the October 23, 2009, hearing at which the parties argued the speedy trial issues, that the original delay from October 26, 2007, through December 10, 2007, was attributable to Thomas having multiple knee surgeries and being unable to testify at the preliminary hearing. Additionally, the delay from April 27, 2009, to May 11, 2009, was also due to Thomas' knee injury and resultant surgery. The total delay caused by Thomas' knee injury only amounted to approximately 2 months, which was not a significant delay. In *Barker*, the United States Supreme Court found that the illness of the chief investigating officer in the case was a "strong excuse" for delay. 407 U.S. at 517-18. Therefore, Thomas' injury justified the delay it caused. Overall, there does not

seem to be "[a] deliberate attempt to delay the trial in order to hamper the defense," as would weigh heavily against the State. 407 U.S. at 531.

### Waldrup's assertion of rights

The third *Barker* factor is the defendant's responsibility to assert his or her speedy trial right. 407 U.S. at 530. The record is unclear when Waldrup first learned of the 2008 drug charges pending against him in Kansas. Nevertheless, the State does not deny that Waldrup continually asserted his speedy trial rights throughout the proceedings. Thus, this factor weighs in favor of Waldrup's constitutional claim.

### Prejudice to the defendant

The fourth *Barker* factor is prejudice to the defendant. 407 U.S. at 530.

"Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." 407 U.S. at 532.

Waldrup does not argue the first interest; because he was incarcerated on unrelated charges, the concern over oppressive pretrial incarceration is unwarranted in this case. As to the second interest, Waldrup testified to the district court that the knowledge of outstanding charges in Kansas caused him anxiety while he was incarcerated in Missouri. Waldrup focuses on the assertion that the delay impaired his ability to defend himself.

The district court held a hearing at which it heard arguments and testimony on the possible prejudice the delay caused Waldrup. At the hearing, Waldrup called Maria Walser, the private investigator hired to provide investigative services for Waldrup. Walser began working on the case in May 2009 and testified generally about the trouble she had investigating a case based on events that occurred in 2007. For example, Walser testified she was unable locate the woman who purportedly drove Waldrup to the first drug sale. The State argues that Walser's testimony did not establish a

legitimate showing of prejudice. As the district court noted, the loss of contact information for Waldrup's alleged witnesses was due to Waldrup's admitted decision to disconnect from friends and family upon his incarceration. Overall, Waldrup has failed to show more than minimum prejudice caused by the delay in prosecution.

None of the *Barker* factors is controlling; rather, the factors must be considered together with any other relevant circumstances. 407 U.S. at 533. The fact that the State complied with the speedy trial dictates of the Agreement is a relevant factor to consider in determining whether there has been a violation of Waldrup's constitutional right to a speedy trial. Considering further the length of the delay in Waldrup's case, the reason for the delay, Waldrup's assertion of his rights, and the minimal prejudice to Waldrup as a result of the delay, we conclude the district court did not err in finding that Waldrup's constitutional right to a speedy trial was not violated.

### JURY INSTRUCTION ON TESTIMONY OF CONFIDENTIAL INFORMANT

Next, Waldrup contends the district court erred when it refused to give a jury instruction cautioning the jury about testimony of a confidential informant. The jury instruction reads: "You should consider with caution the testimony of an informant who, in exchange for benefits from the State, acts as an agent for the State in obtaining evidence against a defendant, if that testimony is not supported by other evidence." PIK Crim. 3d 52.18-A. Waldrup requested the jury instruction because of Roubison's testimony. The district judge denied Waldrup's request, reasoning that Roubison's testimony was largely corroborated.

" 'In general, when considering the refusal of the trial court to give a specific instruction, the evidence is viewed in the light most favorable to the party requesting the instruction. [Citation omitted.] In cases where a defendant objects to instructions, this court is required to consider the instructions as a whole and not isolate any one instruction. [Citation omitted.] " ' "If the instructions properly and fairly state law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous." ' " [Citations omitted.]' [Citation omitted.]" *State v. Edwards*, 291 Kan. 532, 551, 243 P.3d 683 (2010).

Roubison qualified as an informant because she was acting as an agent of the State at the time she supplied information to the DEU about Waldrup. Also, Thomas testified that Roubison received certain benefits from the DEU in exchange for her cooperation, including $60 to have Roubison's car towed after her tires were slashed, $38.18 toward new tires, and $10.73 in cell phone charges. Also, Thomas talked to the Lawrence city prosecutor about an outstanding municipal warrant on Roubison, which Thomas believed was later dismissed.

The law is well settled that a cautionary instruction on the testimony of an informant is only required when the informant's testimony is substantially uncorroborated and provides the sole basis for the defendant's conviction. *State v. Fuller*, 15 Kan. App. 2d 34, 39, 802 P.2d 599 (1990), *rev. denied* 248 Kan. 997 (1991). Here, Roubison's testimony was neither uncorroborated nor the sole basis for Waldrup's conviction. Thomas accompanied Roubison to both drug buys, testified extensively regarding what he saw, and identified Waldrup as the man from whom Roubison and Thomas purchased drugs. Also, Jones corroborated the second drug transaction at the Pool Room. Furthermore, the jury listened to the audio recordings of the phone calls setting up the transactions and the transactions themselves.

Finally, the district court instructed the jury on the general credibility of witnesses: "It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness has testified." Therefore, the jury instructions as a whole fairly and properly stated the applicable law. Because Roubison's testimony was corroborated, we conclude the district did not err in refusing to give the cautionary jury instruction regarding the testimony of a confidential informant.

LIMITING CROSS-EXAMINATION OF CONFIDENTIAL INFORMANT

Next, Waldrup argues that the district court erred by limiting his cross-examination of Roubison regarding medication she was taking at the time of trial. While cross-examining Roubison, Waldrup asked if she was on any medication, and Roubison replied that

she was on hormone replacements, antidepressants, mood stabilizers, and pain medication. When asked if any of the drugs affected her ability to remember past events, she said the mood stabilizers helped her focus. The State objected on relevancy grounds when Waldrup asked what pain medications Roubison was taking. The district judge recessed court and heard argument in chambers.

In chambers, the district judge asked Roubison what pain medications she was taking, and Roubison replied that she was on 25 milligram Fentanyl patches and 7.5 milligram hydrocodone pills. Waldrup argued that Roubison's use of these specific medications was relevant and that he was entitled to present that information to the jury. The State replied there was no evidence that these drugs had the capacity to affect someone's ability to remember past events; therefore, there was no legal basis to inquire into the medications. The district judge asked Roubison directly if the hydrocodone affected her memory, and she stated no and further asserted that her Fentanyl patch did not affect her current or past memory. The district judge ruled that Waldrup could not inquire about the specific pain medications Roubison was taking, but that Waldrup could ask Roubison if the pain medications affected her short-term or long-term memory. Upon resuming cross-examination, Waldrup asked Roubison if any of her medications had an impact on her ability to recall past events, and she answered, "No."

When reviewing a district court's decision concerning the admission of evidence, an appellate court first determines whether the evidence is relevant. All relevant evidence is admissible unless statutorily prohibited. K.S.A. 60-407(f); *State v. Riojas*, 288 Kan. 379, 382, 204 P.3d 578 (2009). Evidence is relevant if it has "any tendency in reason to prove any material fact." K.S.A. 60-401(b). There are two elements of relevant evidence: a materiality element and a probative element. *State v. Houston*, 289 Kan. 252, 261-62, 213 P.3d 728 (2009). Evidence is probative if it has " 'any tendency in reason to prove' " a fact. *State v. Reid*, 286 Kan. 494, 505, 186 P.3d 713 (2008) (citing K.S.A. 60-401[b]). The issue of whether evidence is probative is reviewed under an abuse of discretion standard whereas the materiality of evidence is reviewed de novo. *State v. Berriozabal*, 291 Kan. 568, 586, 243 P.3d 352 (2010). However,

even if evidence is both probative and material, the trial court must still determine whether the probative value of the evidence outweighs its potential for producing undue prejudice. Appellate courts review this determination for abuse of discretion. *State v. Wells*, 289 Kan. 1219, 1227, 221 P.3d 561 (2009).

On appeal, Waldrup argues that the names of the drugs Roubison was taking at the time of trial were relevant "to attack Roubison's memory of the events." Both parties agree that our Supreme Court has stated:

"For purposes of discrediting a witness, drug-use evidence is admissible to the extent it shows the witness was under the influence of drugs at the time of the occurrence as to which the witness testifies or at the time of trial. It is also admissible to the extent that it shows the witness' mind, memory, or powers of observation were affected by the habit." *State v. Osby*, 246 Kan. 621, Syl. ¶ 2, 793 P.2d 243 (1990).

Waldrup, has not shown how the *names* of the medications Roubison was taking were relevant or have "any tendency in reason to prove any material fact." See K.S.A. 60-401(b). As the State points out, the district court allowed Waldrup to cross-examine Roubison on whether she was taking medications, the general kinds of medications she was taking, and whether those medications affected her ability to remember past events. Roubison testified that the medications did not negatively affect her memory or her ability to recall the events in question. We conclude the district court did not err by limiting Waldrup's cross-examination as to the specific names of Roubison's medications.

UNANIMITY INSTRUCTION ON MULTIPLE ACTS

Waldrup next argues that the district court erred in failing to give a unanimity instruction to the jury with respect to the sale of cocaine charges. Waldrup contends the alleged telephone conversations in which he offered to sell the cocaine and the actual sales of the cocaine in the parking lots constitute multiple acts on which the jurors could have based the guilty verdicts. The State responds that this is not a multiple acts case and no unanimity instruction was required.

"[T]his court [has] set out a three-part test to determine when a multiple acts situation has occurred such that the jury must agree on the same underlying criminal act. First, the court must determine if the case truly involves multiple acts, *i.e.*, whether the defendant's conduct was part of one act or represents multiple acts which are separate and distinct from each other. Second, the court must consider whether error occurred, *i.e.*, whether there was a failure by the State to elect an act or a failure by the trial court to instruct. Third, the court must determine whether the error is reversible. [Citation omitted.]" *State v. Colston*, 290 Kan. 952, 961-62, 235 P.3d 1234 (2010).

An appellate court must first determine whether it is presented with a multiple acts case. This is a question of law over which an appellate court exercises unlimited review. *State v. Foster*, 290 Kan. 696, 713, 233 P.3d 265 (2010). Our Supreme Court has identified four factors useful for determining if a case truly involves multiple acts: "(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." *State v. Schoonover*, 281 Kan. 453, 507, 133 P.3d 48 (2006).

Waldrup was charged with two counts of sale of cocaine based upon the separate and distinct transactions that occurred on July 6, 2007. Waldrup contends the jury could have convicted him based either on the actual sales of cocaine at the Fast Lane gas station and the Pool Room or based on the *offers to sell* the cocaine that occurred during the telephone calls between Waldrup and Roubison. The State, on the other hand, asserts that the offers to sell and the actual sales were part of a continuing course of conduct and therefore this is not a multiple acts case.

The State is correct; the actual sales of the cocaine were part of the continuing course of conduct that included the offers to sell cocaine that occurred during the telephone calls. Each of the two drug transactions—at the Fast Lane gas station and at the Pool Room—occurred within a short period of time of the phone calls initiating the transactions. Although the telephone "offers" and the actual sales did not occur at the same location, this does not necessarily mean they constitute multiple acts. Moreover, there was a causal connection between the acts: the telephone calls, including

the offers, initiated the series of events that led directly to the drug buys. There was no intervening event that separated the telephone offers from the actual sales. Finally, there was no evidence of a fresh impulse motivating the actual drug sales that was not present in the telephone offers.

Therefore, under the *Schoonover* factors, these were not multiple acts. Because this is not a multiple acts case, further analysis is unnecessary. See *State v. Stevens*, 285 Kan. 307, 314, 172 P.3d 570 (2007) (stating where the defendant's conduct was "a continuing course of conduct not motivated by a fresh impulse" as opposed to multiple acts, "a further multiple acts analysis is unwarranted"); *State v. Kesselring*, 279 Kan. 671, Syl. ¶ 6, 112 P.3d 175 (2005) ("A multiple acts instruction is not necessary when the allegations relate to a continuous incident that cannot be factually separated."). Waldrup's multiple acts claim fails.

## CUMULATIVE ERROR

Finally, Waldrup claims he was denied a fair trial based on cumulative error. Even if an individual error is insufficient to support reversal, the cumulative effect of multiple errors may be so great as to require reversal. The test is " 'whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant.' [Citation omitted.]" *Edwards*, 291 Kan. at 553.

"Cumulative error will not be found when the record fails to support the errors raised on appeal by the defendant. [Citations omitted.]" *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 (2009). Because all of Waldrup's claims of error failed, his claim of cumulative error fails as well.

Affirmed.