(281 P.3d 576)
No. 106,015

STATE OF KANSAS, *Appellee*, v. ROGER SHAW, *Appellant*.

 Opinion filed
July 20, 2012. 

Michelle A. *Davis*, of Kansas Appellate Defender Office, for appellant.

*Heather R. Jones*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., MARQUARDT, J., and KNUDSON, S.J.

*Per Curiam*: Roger Shaw appeals his conviction of involuntary manslaughter while driving under the influence of alcohol. For the first time on appeal, Shaw argues that we must reverse his conviction because the district court instructed the jury on multiple alternative means of committing the crime and the State failed to present sufficient evidence of each alternative means. In addition, Shaw contends that the district court violated his constitutional rights by sentencing him based in part on his criminal history without first requiring that the criminal history be alleged in the complaint and proven beyond a reasonable doubt to a jury. We agree with Shaw that involuntary manslaughter while driving under the influence of alcohol is an alternative means crime. We also agree with Shaw that the State failed to present substantial evidence of at least one of the alternative means of committing the crime. Accordingly, we reverse Shaw's conviction and remand for a new trial.

The tragic events of this case unfolded on a Sunday afternoon, July 19, 2009. Adam and Aaron Kichler were brothers and spent a lot of time together, often riding their motorcycles. At approximately 2:45 p.m., Adam and Aaron left their parents' home in Ottawa to ride their motorcycles to Wellsville and then on to Kansas City to see a movie. Adam later testified that they were not in a hurry and they did not exceed the speed limit on the county road, which was 55 miles per hour. The two young men rode staggered; Aaron rode in front near the center line, and Adam rode approximately 12 to 15 feet behind him near the fog line by the shoulder of the road. The brothers drove eastbound on Shawnee Road toward Wellsville.

Meanwhile, Roger Shaw and Dennis Ameigh were traveling back to Shaw's house from a trip to buy car parts; Shaw was driving his truck westbound on Shawnee Road. Adam testified that when

he and Aaron were a quarter mile from the intersection of Shawnee Road and Texas Road, he saw a red truck coming in the opposite lane; the truck had slowed down to a "slow roll." Adam testified that as they came upon the truck, he "saw the front end of the truck lift up," meaning that the driver was sharply accelerating and beginning to turn left in front of the approaching motorcycles. Adam testified that he saw the truck's wheels turn and he heard Aaron yell. Aaron's motorcycle hit the truck. Adam locked his brakes and turned to the left, avoiding the truck by an inch or two.

Shanta Kemp, who lived nearby, was driving home, saw the aftermath of the collision, stopped, and called 911. During her 911 call, Kemp informed the dispatcher that she could smell alcohol on Shaw's breath. Emergency services personnel were dispatched to the scene and pronounced Aaron dead at the scene.

Joanna Buchorn, an emergency medical technician who treated Shaw at the scene, later testified that Shaw told her that he had consumed "a couple of beers" prior to the accident and repeatedly told her that he had not seen the motorcycles. Kyle Lasswell, who was employed by the Wellsville Police Department and had been dispatched to the collision, later testified that he and Adam saw an empty beer box on the ground by Shaw's truck. Franklin County Sheriff's Deputy Carl Bentley testified that when he talked with Shaw at the scene, he smelled a faint odor of alcohol coming from Shaw and that Shaw admitted to drinking three beers that day. According to Bentley, Shaw told him that the sun was in his eyes as he made the left turn from Shawnee Road onto Texas Road and he could not see the motorcycles. At the request of law enforcement, Buchorn obtained a blood sample from Shaw at 3:42 p.m. The blood sample tested at a .11 blood alcohol level, above the legal limit of .08.

On November 19, 2009, the State charged Shaw with involuntary manslaughter while driving under the influence of alcohol or drugs, in violation of K.S.A. 21-3442. The jury trial occurred October 4-8, 2010. The main point of contention at trial was the identification of the direct cause of the collision and, therefore, Aaron's death. The State argued that Shaw's intoxication was the cause of the collision, while Shaw contended that Aaron had been speeding.

The State presented testimony from Emily Wood, the 911 dispatcher who received Kemp's call, which included the information that Kemp could smell alcohol on Shaw's breath. Kemp also testified for the State. In addition to stating that she smelled alcohol on Shaw's breath, Kemp testified that when she had seen the motorcycles drive by a few minutes prior to the collision, she did not believe they were speeding. Buchorn also testified about Shaw's admission that he had consumed "a couple of beers" prior to the accident. Adam Kichler testified as to the events of the day and specifically stated that neither he nor Aaron was speeding.

The State also offered testimony from law enforcement officials including Lasswell, Bentley, and Franklin County Sheriff's Deputy Brian Ferguson, who photographed the scene and took measurements. Franklin County Sheriff Jeffrey Curry, who at the time of the collision was a patrol sergeant, also testified for the State. Curry had conducted a speed analysis on Adam's motorcycle primarily by considering the length and direction of the skid marks. Curry determined that Adam was going 41-47 miles per hour at the point he locked up his rear brake. Because Adam and Aaron were traveling together, Curry stated it was reasonable to assume they were going the same speed and he had no reason to believe Aaron was driving faster than the posted speed limit of 55 miles per hour. In addition, each law enforcement officer testified that, at mid-afternoon on the day in question, the sun did not detrimentally affect his vision while driving to the scene of the collision.

The State also called Dr. Christopher Long, who had analyzed bodily fluids taken from Aaron and testified that the tests showed that sometime in the 20 hours prior to the accident, Aaron had taken hydrocodone and Tylenol, but that the levels present would not have caused impairment. Dr. Joel Kavan, a family physician, testified that he had treated Aaron on July 8, 2009, and prescribed hydrocodone and an anti-nausea medication for Aaron's back pain.

Next, the State presented the testimony of Andy Buck, a senior field claims adjuster for Farm Bureau Life Insurance Services assigned to investigate the collision. Buck interviewed Shaw as part of his investigation. Buck testified that Shaw told him that he had consumed two and one-half beers over a 3-hour period on July 19,

2009. Shaw told Buck that prior to the collision, he had seen the motorcycles traveling toward him but after he began his turn, he looked up and the motorcycles were "right there." Shaw told Buck that he believed the motorcyclists were racing and that Aaron could have avoided hitting his truck.

Dr. Erik Mitchell, the forensic pathologist who performed the autopsy on Aaron, testified about Aaron's extensive injuries, both internal and external, and that the injuries were consistent with direct impact with a vehicle. Jennifer Agee, a forensic toxicologist with the Kansas Bureau of Investigation, testified that she had analyzed Shaw's blood sample and found .11 grams of ethyl alcohol per 100 milliliters of blood, which is above the legal limit in Kansas of .08.

Finally, the State presented the testimony of Robert McKinzie, an accident reconstruction specialist, who had performed a reconstruction of the collision. McKinzie based his analysis on an examination of the sheriff's department file, photographs of the crash site, a visit to the crash site, information from witnesses, and a transcript. In McKinzie's opinion, the sun was not a factor in the collision, nor was the weather or the layout of the road. McKinzie also analyzed the speed of Adam's motorcycle and determined that Adam—and by implication Aaron—had been traveling 52 or 53 miles per hour at the time of the accident.

Shaw presented the testimony of four witnesses, but he made no attempt to dispute the State's evidence that he had been drinking prior to the accident and that his blood alcohol content was above the legal limit. Shaw recalled Ferguson to answer a question about the geography around the intersection, and he also called the tow truck operator who removed the vehicles from the scene.

Next, Shaw called Ameigh, his passenger at the time of the collision. Ameigh testified that, on the day in question, he and Shaw were traveling back from Gardner, where they had gone to buy parts for the car they were repairing. Ameigh further testified that Shaw was not speeding as they approached the turn from Shawnee Road onto Texas Road and that he slowed to make the turn, made a steady turn, and did not accelerate sharply. Ameigh stated that as they were preparing to turn, he saw the lights of two motorcycles

at the top of a nearby hill; he thought they were at least a quarter of a mile away. Ameigh did not think the motorcycles were coming very quickly or that they were racing; he glanced away for a few seconds and, when he looked back up, he saw a motorcycle sliding toward the truck.

Shaw's final witness was John Glennon, a forensic automotive technologist and full-time accident reconstructionist. Glennon read the police reports, reviewed photographs of the scene, and read Curry's reconstruction report. He also visited the crash site, but not until March 2010. Glennon determined that Shaw's truck moved south and east after the collision and was pushed by the motorcycle. He concluded that the minimum impact speed of Aaron's motorcycle was 84 miles per hour. In his report, Glennon approximated Aaron's speed at 92 miles per hour. After Glennon's testimony, Shaw rested his case.

In closing arguments, both parties focused on the estimated speed at which Aaron was driving immediately prior to the collision. The State emphasized its contention that Aaron and Adam were not speeding and that Shaw was intoxicated to the point of being incapable of safely driving. Shaw, on the other hand, argued that Aaron and Adam were speeding and challenged the State's witnesses' calculations that placed the speed of the motorcycles below the speed limit. Shaw's counsel put it bluntly: "The cause of this collision was high speed."

The jury deliberated approximately 2 hours, and there were no questions from the jury or requests for the read-back of any testimony. The jury found Shaw guilty of involuntary manslaughter while driving under the influence of alcohol to a degree that rendered him incapable of safely driving. At sentencing, Shaw did not object to his criminal history, which included three prior convictions of driving under the influence of alcohol (DUI). The district court sentenced Shaw to 120 months' imprisonment. Shaw timely appealed his conviction and sentence.

For the first time on appeal, Shaw argues that we must reverse his conviction of involuntary manslaughter while driving under the influence of alcohol because the district court instructed the jury on alternative means of committing the crime and the State failed

to present sufficient evidence of each alternative means. Shaw also contends that the district court violated his constitutional rights by sentencing him based in part on his criminal history without first requiring that the criminal history be alleged in the complaint and proven beyond a reasonable doubt to a jury. The State argues that the jury was presented with sufficient evidence to convict Shaw of involuntary manslaughter while driving under the influence of alcohol. The State further argues that the district court correctly sentenced Shaw.

Both parties agree that when the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. McCaslin*, 291 Kan. 697, 710, 245 P.3d 1030 (2011). The State also argues that because Shaw did not make any substantive objection to the jury instruction setting forth the elements of the crime including the alternative means of committing the crime, we should review whether the jury instruction was clearly erroneous. See K.S.A. 22-3414(3). "An instruction is clearly erroneous only if the reviewing court is firmly convinced there is a real possibility the jury would have returned a different verdict if the trial error had not occurred." *State v. Martinez*, 288 Kan. 443, 451-52, 204 P.3d 601 (2009).

Shaw's primary contention is that this is an alternative means case and the State failed to present sufficient evidence of each alternative means of committing involuntary manslaughter while driving under the influence of alcohol. Although Shaw did not raise this argument below, this court has previously held that an alternative means error can be raised for the first time on appeal. See *State v. Waldrup*, 46 Kan. App. 2d 656, 663, 263 P.3d 867 (2011) (alternative means challenge can be raised for the first time on appeal because it implicates insufficiency of evidence to support the conviction), *petition for rev. filed* November 16, 2011; *State v. Rivera*, 42 Kan. App. 2d 914, 918, 218 P.3d 457 (2009) (stating that a criminal defendant need not challenge the sufficiency of the

evidence before the district court to preserve the issue for appeal), *rev. denied* 290 Kan. 1102 (2010).

Our Supreme Court has stated the following rule of law governing alternative means cases in Kansas:

" ' "In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means. [Citations omitted.] In reviewing an alternative means case, the court must determine whether a rational trier of fact *could* have found each means of committing the crime proved beyond a reasonable doubt. [Citations omitted.]" ' " *State v. Wright*, 290 Kan. 194, 202, 224 P.3d 1159 (2010) (quoting *State v. Timley*, 255 Kan. 286, 289, 875 P.2d 242 [1994]).

Shaw was convicted of violating K.S.A. 21-3442, which provides: "Involuntary manslaughter while driving under the influence of alcohol or drugs is the unintentional killing of a human being committed in the commission of, or attempt to commit, or flight from an act described in K.S.A. 8-1567 and amendments thereto." K.S.A. 8-1567(a)(3) prohibits a person from operating or attempting to operate a vehicle while under the influence of alcohol to a degree that renders the person incapable of safely driving the vehicle. The statute also prohibits a person from operating or attempting to operate a vehicle while the alcohol concentration in the person's blood or breath is .08 or more. See K.S.A. 8-1567(a)(1) and (2). Shaw was charged with a complaint that mirrored the statutory language.

At trial, the district court instructed the jury as follows:

"The defendant is charged with the crime of involuntary manslaughter while driving under the influence of alcohol. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant unintentionally killed Aaron Kichler;

"2. That it was done in the commission of, while attempting to commit, or while in flight from committing or attempting to commit the act of operating any vehicle in this state

(a) While under the influence of alcohol to a degree that rendered him incapable of safely driving a vehicle; and/or

(b) While having an alcohol concentration of .08 or more as measured within two hours of the time of operating or attempting to operate the vehicle; and

"3. That this act occurred on or about the 19th day of July, 2009, in Franklin County, Kansas.

"The phrase 'alcohol concentration' means the number of grams of alcohol per 100 milliliters of blood.

"The fault or lack of fault of Aaron Kichler is a circumstance to be considered along with all the other evidence to determine whether the defendant's conduct was or was not the direct cause of Aaron Kichler's death."

The only objection Shaw raised to the jury instruction was that the last sentence should be given in the form of a separate instruction. Shaw raised no objection to the second claim or element of the crime as instructed by the jury, and, in fact, there was no discussion between the district judge and counsel about the language of the second claim or element of the crime during the jury instruction conference.

On appeal, Shaw argues that this instruction contained alternative means of committing the crime, allowing the jury to find Shaw guilty of involuntary manslaughter if he unintentionally killed Aaron committed in the (1) commission of, (2) attempt to commit, or (3) flight from a DUI. Shaw does not argue that the State presented insufficient evidence to support his conviction of involuntary manslaughter committed in the commission of DUI. But Shaw argues that the State presented insufficient evidence to support his conviction of involuntary manslaughter committed in an attempt to commit DUI. Shaw also argues that the State presented insufficient evidence to support his conviction of involuntary manslaughter committed in flight from a DUI.

We must first determine whether involuntary manslaughter while driving under the influence of alcohol in violation of K.S.A. 21-3442 is an alternative means crime. We do so by examining the statutory definition of the crime. Interpretation of a statute is a question of law over which an appellate court has unlimited review. *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010).

The legislature has not statutorily defined an alternative means crime, nor specified which crimes are alternative means crimes. This is left to judicial determination. This court has adopted the following definition:

"Alternative means essentially entail materially different ways of committing a particular crime based on the statutory definition or elements of the offense.

When criminal statutes create two or more distinct ways of committing an offense, those ways reflect alternative means. Other criminal statutes establish only one way to commit an offense, although they may use synonymous or redundant terms to define the prohibited conduct. Such statutes do not create alternative means." *State v. Schreiner*, 46 Kan. App. 2d 778, Syl. ¶ 1, 264 P.3d 1033 (2011), *petition for rev. filed* December 5, 2011.

Under the plain language of K.S.A. 21-3442, there are three alternative means to commit the crime of involuntary manslaughter while driving under the influence of alcohol: the unintentional killing of a human being committed in the (1) commission of, (2) attempt to commit, or (3) flight from an act described in K.S.A. 8-1567 and amendments thereto. The State does not deny that this is an alternative means case.

Next, we must consider whether the State presented substantial evidence to prove each alternative means. See *Wright*, 290 Kan. at 202. As previously stated, Shaw does not argue that the State presented insufficient evidence of involuntary manslaughter committed in the commission of DUI. But Shaw argues that the State presented insufficient evidence to support his conviction of involuntary manslaughter committed in an attempt to commit DUI. Shaw notes that in *State v. Stevens*, 285 Kan. 307, 314-19, 172 P.3d 570 (2007), the Kansas Supreme Court held that under K.S.A. 2006 Supp. 8-1567, operating and attempting to operate a vehicle present alternative means to commit the crime of DUI. The *Stevens* court went on to determine that there was sufficient evidence to support each alternative means under the facts of the case. 285 Kan. at 316-19.

The State argues that, because it presented sufficient evidence to find Shaw guilty of unintentionally killing Aaron while committing the act of DUI, it necessarily presented sufficient evidence to find him guilty of unintentionally killing Aaron while *attempting* to commit the act of DUI. The State relies on *State v. Perkins*, 46 Kan. App. 2d 121, 257 P.3d 1283 (2011), *rev. granted* December 19, 2011, *argued* April 11, 2012. In *Perkins*, the defendant was convicted under K.S.A. 2008 Supp. 8-1567 for operating or attempting to operate a vehicle while under the influence of alcohol. On appeal, the defendant argued that there was insufficient evi-

dence to support each alternative means of committing the crime. The defendant noted that K.S.A. 21-3301 defines attempt as " 'any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime.' " 46 Kan. App. 2d at 124. The defendant argued that there was no evidence in his case that he attempted but failed to commit the crime of DUI.

Acknowledging the decision in *Stevens*, this court found that operating or attempting to operate a vehicle while under the influence of alcohol created alternative means of committing the crime. 46 Kan. App. 2d at 122-23. But this court rejected the defendant's application of K.S.A. 21-3301 to define attempt as that term is used under K.S.A. 8-1567. This court noted that under the DUI statute, an attempt is "treated as the legal equivalent of the completed offense and carries the same punishment," while the criminal attempt statute codifies a type of crime different and separate from a completed offense. 46 Kan. App. 2d at 124-25. This court further noted that while criminal attempt requires that the perpetrator intend to commit the crime, the DUI statute requires no such intent. This court found that the DUI statute's specific mention of attempt controls over the more general application of the criminal attempt statute. 46 Kan. App. 2d at 126-27. This court concluded that "[f]or purposes of K.S.A. 2008 Supp. 8-1567, then, a driver who actually operates a vehicle necessarily also attempts (successfully) to do so," although "[t]he converse would not necessarily be true." 46 Kan. App. 2d at 127.

We agree with the rationale expressed in *Perkins*. Thus, it is unnecessary for this court to search for evidence in the record that Shaw attempted to commit a DUI but failed to do so. Following the *Perkins* rationale, by presenting substantial evidence that Shaw committed involuntary manslaughter during the commission of DUI, we conclude the State necessarily presented substantial evidence that Shaw committed involuntary manslaughter during the attempted commission of DUI. However, we acknowledge that *Perkins* is under review by our Supreme Court.

Next, Shaw argues that the State presented insufficient evidence to support his conviction of involuntary manslaughter committed in flight from a DUI. As Shaw notes, our Supreme Court has stated that "[f]light has been defined simply as '[t]he act or an instance of fleeing, esp. to evade arrest or prosecution.' [Citation omitted.]" *State v. Rogers*, 282 Kan. 218, 230, 144 P.3d 625 (2006). Shaw argues there is no evidence to support the inference that he was attempting to flee from the commission of DUI or to evade arrest or prosecution for DUI.

The State first replies that the language "flight from" committing a DUI under K.S.A. 21-3442 is superfluous and does not create an alternative means of committing involuntary manslaughter. Our Supreme Court, however, has held that the rules of statutory construction attempt to avoid rendering statutory language meaningless or superfluous. See *State v. Sedillos*, 279 Kan. 777, 784, 112 P.3d 854 (2005) (stating that rendering a portion of the statute "superfluous or meaningless [is] a result sought to be avoided by the rules of statutory construction"); *State v. Burhans*, 277 Kan. 858, 871, 89 P.3d 629 (2004) (" 'If reasonably possible, this court is to avoid statutory constructions that make part of a statute surplusage.' [Citation omitted.]").

Alternatively, the State contends that it presented sufficient evidence of flight. Although the State made no argument during the trial that the evidence established flight from a DUI, the State asserts on appeal that Shaw was "trying to get home without being caught driving under the influence" and was therefore fleeing from the commission of DUI. The citation the State gives to support this statement is merely to Ameigh's testimony that the collision occurred while he and Shaw were returning to Shaw's house from Gardner. Although the record establishes that the accident occurred near Shaw's home, there is nothing in the record that supports the State's contention that Shaw was "trying to get home without being caught driving under the influence."

Moreover, our Supreme Court has treated "flight" as coming after a completed crime, not an ongoing crime. See *State v. Kunellis*, 276 Kan. 461, 467-74, 78 P.3d 776 (2003) (examining felony-murder statute, which criminalized the killing of a human being in

the commission of, attempt to commit, or flight from an inherently dangerous felony and referring to flight from that "completed crime"). Under the ordinary meaning of the language of K.S.A. 21-3442, there must be evidence of a separate flight from the crime of DUI to support a conviction under this alternative means. Here, there was absolutely no evidence presented at trial that Shaw committed involuntary manslaughter in flight from a DUI. Therefore, because there was insufficient evidence to support one of the alternative means, the conviction was in error.

The Kansas Supreme Court has stated: " '[A] reversal mandated by *Timley* [based on an alternative means error] is a reversal for *insufficient evidence*. An insufficiency error cannot be harmless because it means the State failed to meet its burden of proving the defendant guilty beyond a reasonable doubt. This is a most basic guarantee of due process in criminal cases.' " *Wright*, 290 Kan. at 205 (quoting Beier, *Lurching Toward the Light: Alternative Means and Multiple Acts Law in Kansas*, 44 Washburn L.J. 275, 299 (2005). Thus, in *Wright* the Kansas Supreme Court holds that an alternative means error is not subject to harmless error analysis. 290 Kan. at 205. The Court of Appeals is duty bound to follow Kansas Supreme Court precedent, absent some indication the court is departing from its previous position. *State v. Jones*, 44 Kan. App. 2d 139, 142, 234 P.3d 31 (2010), *rev. denied* 292 Kan. 967 (2011). Thus, we will not engage in any analysis of whether the alternative means error committed in this case can be considered harmless.

Shaw's brief concludes by requesting this court to reverse his conviction. No issue is raised by either party as to whether Shaw can be retried for involuntary manslaughter while driving under the influence of alcohol. Arguably, the legal issue of whether Shaw can be retried for the offense is not ripe for determination. But in the interest of judicial economy, it makes sense to address the issue now in order to save the parties the time and expense of having a second trial that may be found to be legally barred. See *State v. Hernandez*, 294 Kan. 200, 208-11, 273 P.3d 774 (2012) (court addressed, but did not decide, whether defendant could be retried

for off-grid version of aggravated indecent liberties after his conviction for on-grid version was reversed and remanded for retrial).

The remedy for an alternative means error remains unsettled in Kansas. Because an alternative means error implicates insufficiency of the evidence to support the conviction, arguably an alternative means error results in reversal of the conviction and retrial is barred by double jeopardy. See *Burks v. United States*, 437 U.S. 1, 11, 16-18, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978) (reversal for insufficient evidence is akin to judgment of acquittal warranting double jeopardy protection). This court has taken this position without specifically addressing the issue. See *Perkins*, 46 Kan. App. 2d at 128-32 (reversing conviction of driving while suspended due to alternative means error and entering a judgment of acquittal); *State v. Owen*, No. 102,814, 2011 WL 2039738, at *1-5 (Kan. App. 2011) (unpublished opinion) (reversing convictions of forgery due to alternative means error), *rev. granted* February 17, 2012; see also dicta in *State v. Boyd*, 46 Kan. App. 2d 945, 948-49, 268 P.3d 1210 (2011), (stating the presumed remedy for insufficient evidence of an alternative means crime is reversal and entry of a judgment of acquittal), *petition for rev. filed* January 23, 2012; *cross-petition for rev. filed* February 6, 2012.

In *State v. Crane*, 260 Kan. 208, 918 P.2d 1256 (1996), the defendant was convicted of multiple crimes including lewd and lascivious behavior and kidnapping. On appeal, our Supreme Court affirmed the defendant's conviction of lewd and lascivious behavior. As to kidnapping, our Supreme Court found that, as charged, the kidnapping statute presented the alternative means of kidnapping by "taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person: . . . (b) To facilitate flight or the commission of any crime; or (c) To inflict bodily injury or to terrorize the victim or another." 260 Kan. at 230. After reciting the standard of review for an alternative means case and reviewing the facts in the record on appeal, the Supreme Court found that there was insufficient evidence to support a finding that the defendant took or confined his victim to facilitate flight or the commission of another crime. 260 Kan. at 230-34. The court

simply reversed the kidnapping conviction and did not state whether retrial of any sort was appropriate. 260 Kan. at 234.

Although there is no Kansas Supreme Court case directly on point, the Supreme Court of Washington has addressed the remedy to an alternative means error. It is important to note that current alternative means analysis in Kansas is similar to that of Washington. See *Timley*, 255 Kan. at 289 (quoting *State v. Kitchen*, 110 Wash. 2d 403, 410, 756 P.2d 105 [1988], to distinguish between alternative means and multiple acts challenges and to articulate the test for alternative means cases). In *State v. Ramos*, 163 Wash. 2d 654, 660-61, 184 P.3d 1256 (2008), the Washington Supreme Court explicitly discussed double jeopardy principles in an alternative means case:

"The alternative means principle dictates that when a jury renders a guilty verdict as to a single crime, but one of the alternative means for committing that crime is later held to be invalid on appeal and the record does not establish that the jury was unanimous as to the valid alternative in rendering its verdict, double jeopardy does not bar retrial on the remaining, valid alternative mean. [Citations omitted.] This is the case even when one alternative mean has been reversed on appeal due to a finding of insufficient evidence, a finding that has the same double jeopardy implications as an outright acquittal in other circumstances. [Citations omitted.]"

See also *State v. Lucas*, No. 27042-1-II, 2002 WL 399485, at *1-3 (Wash. App. 2002) (unpublished opinion) (first-degree robbery conviction reversed and remanded for new trial after appellate court found insufficient evidence to support one of the alternative means of committing the crime).

Moreover, in her above-referenced law journal article, Justice Beier addressed retrial following an alternative means error as follows:

"In a *Timley* alternative means case, any reversal would be grounded on a failure of proof, a violation of the super-sufficiency condition. Thus retrial on that theory could not be permitted. It, like retrial on any theory held unsupported by sufficient evidence on appeal, would result in double jeopardy. The defendant can only be retried on the theory for which evidence was sufficient the first time, without the pollution of evidence or argument supporting the alternative theory." 44 Washburn L.J. at 294.

In Shaw's case, we are not reversing his conviction because there was insufficient evidence that he committed the crime of involuntary manslaughter while driving under the influence of alcohol; clearly there was sufficient evidence to support Shaw's conviction based on at least one means of committing the crime. Rather, we are reversing Shaw's conviction only because, at least theoretically, the jury could have convicted Shaw based on an alternative means not supported by the evidence, *i.e.*, involuntary manslaughter committed in flight from a DUI. If Shaw's conviction had not been supported by sufficient evidence on *any* of the alternative means of committing the crime, then this would be the functional equivalent of an acquittal and a retrial would be barred by double jeopardy. But we cannot ignore the fact that there *was* sufficient evidence to prove at least one means of committing the crime. In this instance, it stands to reason that the proper remedy is to reverse Shaw's conviction and remand for a new trial only on the alternative means supported by sufficient evidence in the first trial. This remedy does not violate Shaw's double jeopardy rights.

In summary, the State presented sufficient evidence to support Shaw's conviction of involuntary manslaughter committed in the commission of DUI. Our conclusion that the State presented sufficient evidence to support Shaw's conviction of involuntary manslaughter committed in an attempt to commit DUI is based on *Perkins*, 46 Kan. App. 2d at 127. But because *Perkins* is still under review by the Kansas Supreme Court, the safest course of action for the State is to retry Shaw on only one means of committing the crime: the unintentional killing of a human being committed in the commission of DUI. Accordingly, Shaw's conviction of involuntary manslaughter is reversed and remanded for a new trial consistent with this opinion. Because we are reversing Shaw's conviction, we need not address his sentencing issue.

Reversed and remanded with directions.

＊　＊　＊

MALONE, J., concurring: I agree with the majority that under current Kansas Supreme Court precedent, Roger Shaw's conviction of involuntary manslaughter while driving under the influence

of alcohol must be reversed due to an alternative means error. I also agree with the majority that the case should be remanded for a new trial only on the alternative means supported by sufficient evidence in the first trial. I write separately to express my view that an alternative means error, like almost every other kind of trial error, should be subject to harmless error analysis.

Our Supreme Court has stated the following rule of law governing alternative means cases in Kansas:

" ' "In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means. [Citations omitted.]" ' " *State v. Wright*, 290 Kan. 194, 202, 224 P.3d 1159 (2010) (quoting *State v. Timley*, 255 Kan. 286, 289, 875 P.2d 242 [1994]).

I take no issue with applying this rule of law to determine whether an alternative means error has been committed. In fact, this rule of law appears to represent the prevailing view of courts in many states. See Annot., Requirement of Jury Unanimity as to Mode of Committing Crime Under Statute Setting Forth the Various Modes by Which Offense May Be Committed, 75 A.L.R.4th 91.

But in *Wright*, the Kansas Supreme Court went further than necessary by stating that an alternative means error is not subject to harmless error analysis. 290 Kan. at 205. The Supreme Court began the opinion by reaffirming the rule of law initially set forth in *Timley, i.e.*, in an alternative means case, unanimity is not required as to the means by which a crime is committed so long as substantial evidence supports each alternative means. 290 Kan. at 202. But following a discussion of other alternative means cases in Kansas, the Supreme Court specifically disapproved of language in *State v. Dixon*, 279 Kan. 563, 604-06, 112 P.3d 883 (2005), which had allowed harmless error analysis in an alternative means case. 290 Kan. at 206. The *Wright* court determined that *Timley* and *Dixon* " 'simply cannot coexist.' " 290 Kan. at 205.

*Timley* actually contains very little analysis of the alternative means issue. In fact, the opinion only refers to the issue in order to explain the difference between an alternative means case and a

multiple acts case. 255 Kan. at 288-90. *Timley* stated the rule of law to determine whether an alternative means error has been committed, but the opinion never stated that the error could not be harmless. The Supreme Court later explained in *Dixon* that an alternative means error can be harmless. See 279 Kan. at 605-06. So in other words, *Timley* established the rule of law to determine whether an alternative means error has been committed; *Dixon* later clarified that an alternative means error sometimes can be harmless. I believe that the two decisions can peacefully coexist.

I begin by noting that the United States Supreme Court agrees that an alternative means error can be analyzed for harmlessness. In *Hedgepeth v. Pulido*, 555 U.S. 57, 129 S. Ct. 530, 172 L. Ed. 2d 388 (2008), a California jury convicted Michael Pulido of felony murder and, on his direct appeal, Pulido argued that the jury instructions erroneously allowed the jury to find him guilty of felony murder if he formed the intent to aid and abet the underlying felony before the murder *or* if he formed the intent only after the murder. The California Supreme Court found that the latter theory was invalid under California law, but it did not reverse the conviction because the court found that the error did not prejudice Pulido. After his direct appeal, Pulido sought habeas relief in federal court, and the federal district court granted the relief, finding that instructing the jury on the legally invalid theory had a " ' "substantial and injurious effect or influence in determining the jury's verdict." ' " 555 U.S. at 59. The State appealed, and the Ninth Circuit Court of Appeals affirmed the federal district court's decision granting Pulido a new trial. But the Ninth Circuit court went further by agreeing with Pulido that instructing a jury on multiple theories of guilt, one of which is legally improper, is "structural" error that is not subject to harmless error review. See 555 U.S. at 59-60.

The State appealed to the United States Supreme Court. The Court first noted that the precedent relied upon by the Ninth Circuit based its structural error analysis on opinions issued prior to the Court's conclusion in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), that constitutional errors can be harmless. *Hedgepeth*, 555 U.S. at 60. The Court then pointed

out a series of post-*Chapman* cases in which it stated that certain types of instructional error are subject to harmless error analysis. 555 U.S. at 60-61. The Court emphasized that *Neder v. United States*, 527 U.S. 1, 11, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999),

"makes clear that harmless-error analysis applies to instructional errors so long as the error at issue does not categorically ' "vitiate[e] *all* the jury's findings." ' [Citation omitted.] An instructional error arising in the context of multiple theories of guilt no more vitiates *all* the jury's findings than does omission or misstatement of an element of the offense when only one theory is submitted[, as happened in *Neder*]." *Hedgepeth*, 555 U.S. at 61.

The Court went on to state that drawing a distinction between alternative means errors and instructional errors such as those in *Neder* would be " 'patently illogical.' " 555 U.S. at 61. The Court unanimously found that the error in Pulido's case did not constitute structural error, requiring automatic reversal of his conviction. A majority of the Court also found that the Ninth Circuit had not sufficiently engaged in the proper analysis to determine whether the trial error had a substantial and injurious effect or influence in determining the jury's verdict. 555 U.S. at 61-62. Accordingly, the Court remanded to the Ninth Circuit for proper application of the "substantial and injurious effect" analysis to determine whether Pulido was entitled to a new trial. 555 U.S. at 62.

*Hedgepeth* is distinguishable from Shaw's case because the alternative means error in *Hedgepeth* was not based upon insufficient evidence. But the United States Supreme Court has held that an alternative means error based on insufficient evidence of one of the means does not provide an independent basis for reversing an otherwise valid conviction. In *Griffin v. United States*, 502 U.S. 46, 58-60, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991), the Court addressed the following issue: "[W]hether, in a federal prosecution, a general guilty verdict on a multiple-object conspiracy charge must be set aside if the evidence is inadequate to support conviction as to one of the objects." 502 U.S. at 47. After a lengthy discussion of prior cases, the Court stated that it knew of no case in which it had set aside a general verdict "because one of the possible bases of conviction was neither unconstitutional . . . nor even illegal . . .

but merely unsupported by sufficient evidence." 502 U.S. at 56. The Court further explained:

"Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze that evidence [citation omitted]. . . .

"[I]f the evidence is insufficient to support an alternative legal theory of liability, it would generally be preferable for the court to give an instruction removing that theory from the jury's consideration. The refusal to do so, however, does not provide an independent basis for reversing an otherwise valid conviction." 502 U.S. at 59-60.

I have not reviewed the law in every state to ascertain how many state courts apply harmless error analysis in alternative means cases. But Washington is noteworthy because Washington state courts follow the same rule of law governing alternative means cases that Kansas courts follow: In an alternative means case, unanimity is not required as to the means by which a crime is committed so long as substantial evidence supports each alternative means. *State v. Kitchen*, 110 Wash. 2d 403, 410, 756 P.2d 105 (1988); *State v. Nonog*, 145 Wash. App. 802, 811-12, 187 P.3d 335 (2008). Nevertheless, courts in Washington apply harmless error analysis to determine whether an alternative means error constitutes reversible error. In *State v. Lobe*, 140 Wash. App. 897, 167 P.3d 627 (2007), the defendant was convicted of, among other things, two counts of witness tampering, which may be committed by the alternative means of "attempting to induce a person to (1) testify falsely or withhold testimony, (2) absent himself or herself from an official proceeding, or (3) withhold information from a law enforcement agency. [Citation omitted.]" 140 Wash. App. at 902-03. On appeal, the defendant argued that his convictions should be overturned on jury unanimity grounds. The State conceded it had failed to present substantial evidence on each alternative means for each count but argued that the error was harmless.

The Washington Court of Appeals applied harmless error analysis, stating that "where there are three alternative means of committing a crime and the jury is instructed on all three, either (1) substantial evidence must support each alternative means on which evidence or argument was presented or (2) evidence and argument must have only been presented on one means." 140 Wash. App. at 905. In other words, the court reasoned that although substantial evidence was not presented on each alternative means, the verdict could be upheld if evidence was presented on only one means and jury unanimity was assured. Ultimately, the court found that the error in the case required reversal because it left too much doubt as to whether the jury relied on a means for which substantial evidence was not submitted. 140 Wash. App. at 906-07. However, the dissenting opinion would have affirmed the conviction based on harmless error. 140 Wash. App. at 911-13 (Hunt, J., dissenting). See also *State v. Allen*, 127 Wash. App. 125, 130, 110 P.3d 849 (2005) ("But if one or more of the alternative means is not supported by substantial evidence, the conviction must be reversed unless this court can determine that the verdict was based on only one of the alternative means and that substantial evidence supported that alternative means.").

Returning to Kansas law, generally, errors at any stage of trial proceedings are subject to harmless error analysis under K.S.A. 2011 Supp. 60-261, which provides:

"Unless justice requires otherwise, no error in admitting or excluding evidence, *or any other error by the court* or a party, is ground for granting a new trial, for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." (Emphasis added.)

Our Supreme Court has set forth the following test for determining whether an error is harmless:

"[B]efore a Kansas court can declare an error harmless it must determine that the error did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome. The degree of certainty by which the court must be persuaded that the error did not affect the outcome of the trial will vary depending on whether the error implicates a right guaranteed by the United States Constitution.

If it does, a Kansas court must be persuaded beyond a reasonable doubt that there was no impact on the trial's outcome, *i.e.*, there is no reasonable possibility that the error contributed to the verdict. If a right guaranteed by the United States Constitution is not implicated, a Kansas court must be persuaded that there is no reasonable probability that the error will or did affect the outcome of the trial." *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert denied* 132 S. Ct. 1594 (2012).

. Not all errors are subject to this harmless error analysis. Structural error occurs in very limited circumstances where the error " 'affect[s] the framework within which the trial proceeds' " and thus defies analysis by harmless error standards. *Boldridge v. State*, 289 Kan. 618, 627, 215 P.3d 585 (2009) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309-10, 111 S. Ct. 1246, 113 L. Ed. 2d 302 [1991]). Errors which have been found to be structural include the denial of the right to counsel, the denial of the right to public trial, and the denial of the right to trial by jury. *Boldridge*, 289 Kan. at 627-28. But other errors of constitutional magnitude are simply errors in the trial process itself and are subject to harmless error analysis. See *Neder*, 527 U.S. at 8 (" '[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless error analysis.' ").

This brings us to the question: Should an alternative means error be subject to harmless error analysis? An alternative means error presents a hybrid issue. The error is committed when the district court instructs the jury on an alternative means of committing a crime that is not supported by substantial evidence. In this sense, an alternative means error is an instructional error. But the error implicates insufficiency of the evidence to the extent that the jury may have convicted the defendant on at least one means of committing the crime that is not supported by substantial evidence.

The *Wright* court rejected harmless error analysis in alternative means cases with the following reasoning:

" '[A] reversal mandated by *Timley* is a reversal for *insufficient evidence*. An insufficiency error cannot be harmless because it means the State failed to meet its burden of proving the defendant guilty beyond a reasonable doubt. This is a most basic guarantee of due process in criminal cases. [Citation omitted.]

" 'The *Timley* super-sufficiency condition evolved for a good reason. It evolved because we recognized that we were allowing uncertainty as to how the State persuaded each juror. We were comfortable with this uncertainty—at that particular level of generality in the jury's factfinding—only because we insisted on assurance that each juror's vote was supported by a means for which there was sufficient evidence. Without that assurance, we are back to where we were before *Timley*. We have no guarantee that the jury was unanimous at the level of factual generality that matters most of all: guilt v. innocence.' " 290 Kan. at 205 (quoting Beier, *Lurching Toward the Light: Alternative Means and Multiple Acts Law in Kansas*, 44 Washburn L.J. 275, 299 [2005]).

In *Wright*, the Supreme Court reasoned that a reversal based on an alternative means error "is a reversal for insufficient evidence" and thereby cannot be harmless. 290 Kan. at 205. But this is an incomplete analysis of the issue. Granted, an alternative means error means that the State failed to present sufficient evidence to prove at least one of the alternative means of committing the crime. But this fact does not eliminate harmless error from consideration provided there *was* sufficient evidence to prove another means of committing the crime. The question then becomes: Based on the evidence presented at trial and the arguments made to the jury, does the record clearly establish that the jury found the defendant guilty of only the alternative means of committing the crime that is supported by sufficient evidence? If the answer to this question is yes, then we have a unanimous verdict supported by sufficient evidence and the conviction is valid.

I find it noteworthy that the Kansas Supreme Court's treatment of alternative means cases is inconsistent with its treatment of multiple acts cases: A multiple acts error is committed when the prosecutor fails to elect a particular criminal act in which it will rely for a conviction, or the trial court fails to instruct the jurors that all of them must agree on the same underlying criminal act. *Timley*, 255 Kan. at 289. When a multiple acts error is committed, there is uncertainty whether the jury found the defendant guilty of the *same underlying criminal act*. With a multiple acts error, like with an alternative means error, " '[w]e have no guarantee that the jury was unanimous at the level of factual generality that matters most of all: guilt vs. innocence.' " See *Wright*, 290 Kan. at 205. But our Supreme Court holds that a multiple acts error is subject to harm-

less error analysis. *State v. Voyles*, 284 Kan. 239, 252-53, 160 P.3d 794 (2007). If a multiple acts error is subject to harmless error analysis, then an alternative means error also should be analyzed for harmlessness.

The multiple acts issue and the alternative means issue are closely related; both issues implicate jury unanimity but in different ways. Thus, the two issues can be analyzed in a similar manner. Appellate courts can apply a modified three-step analysis for alternative means cases that is similar to the rubric our Supreme Court has adopted for multiple acts cases. See *Voyles*, 284 Kan. at 244-45. Step one: Do we have an alternative means crime? This is determined by examining the statutory definition of the crime to determine whether the statute creates two or more distinct ways of committing an offense. See *State v. Schreiner*, 46 Kan. App. 2d 778, Syl. ¶ 1, 264 P.3d 1033 (2011), *petition for rev. filed* December 5, 2011.

Step two: Assuming the defendant was convicted of an alternative means crime, was error committed? In an alternative means case, error is committed when the district court instructs the jury on alternative means of committing a crime and the State presents insufficient evidence to prove each alternative means. This is the test enunciated in *Timley* and *Wright*.

Step three: Assuming there was an alternative means error, is the error reversible? In a multiple acts case, the ultimate test for harmlessness is the "clearly erroneous" standard articulated by the Kansas Legislature in K.S.A. 22-3414(3). See *Voyles*, 284 Kan. at 252-53. "An instruction is clearly erroneous only if the reviewing court is firmly convinced there is a real possibility the jury would have returned a different verdict if the trial error had not occurred." *State v. Martinez*, 288 Kan. 443, 451-52, 204 P.3d 601 (2009). This standard may be applicable in an alternative means case to the extent that the error is committed when the trial court gives a jury instruction containing an alternative means error and the defendant fails to object.

But generally, the burden to establish harmless error should be on the party who benefits from the error. *Ward*, 292 Kan. at 568-69. Also, the burden to establish harmless error in alternative

means cases should be set high to deter prosecutors and trial judges from routinely infecting jury instructions with alternative means that are not supported by the evidence. And as the *Wright* court stated, an alternative means error implicates " 'a most basic guarantee of due process in criminal cases.' " 290 Kan. at 205. So rather than applying the clearly erroneous standard that is used in a multiple acts case, it seems appropriate in an alternative means case to apply harmless error analysis under K.S.A. 2011 Supp. 60-261, including the test for determining harmless error articulated by the Kansas Supreme Court in *Ward*, 292 Kan. at 565.

Applying this three-step test to the facts herein results in the following analysis. Step one: We have an alternative means crime. Involuntary manslaughter while driving under the influence of alcohol (DUI) can be committed in three distinct ways: in the commission of DUI, in an attempt to commit DUI, or in flight from a DUI. Step two: Error was committed when the district court instructed the jury on an alternative means that was not supported by substantial evidence, *i.e.*, involuntary manslaughter committed in flight from a DUI. Step three: The error was not reversible in this case because the jury never heard evidence concerning flight from a DUI and the prosecutor never argued or even mentioned this theory to the jury. Based on the evidence presented at trial and the arguments made to the jury, there is no reasonable possibility that any one of the jurors could have found Shaw guilty of involuntary manslaughter committed in flight from a DUI. Instead, the record clearly establishes that the jury unanimously found Shaw guilty of involuntary manslaughter committed in the commission of DUI, and this means of committing the crime is supported by sufficient evidence. The only reasonable conclusion is that the alternative means error did not affect Shaw's substantial rights, meaning it did not affect the outcome of the trial. See *Ward*, 292 Kan. at 565.

I respectfully suggest that in *Wright*, the Kansas Supreme Court unnecessarily eliminated harmless error analysis from alternative means cases. This case provides a good example of why that ruling was a mistake. The only issue at Shaw's trial was whether Aaron

Kichler's death was caused by his speeding rather than by Shaw's DUI. Shaw received a fair trial on that issue, and the jury unanimously returned a verdict of guilty, which is supported by sufficient evidence. Today, we are reversing Shaw's conviction due to an error that did not impact the structure of his trial and certainly had no bearing on the outcome of the case. Remand for retrial under these circumstances is both unnecessary and unwarranted.