NOT DESIGNATED FOR PUBLICATION

Nos. 118,357
118,358

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

WILLIAM K. BEMIS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; FAITH A.J. MAUGHAN, judge. Opinion filed September 6, 2019. Affirmed.

*Carol Longenecker Schmidt*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BUSER, P.J., GREEN and MALONE, JJ.

MALONE, J.: William K. Bemis appeals following his convictions of aggravated indecent liberties with a child, indecent liberties with a child, electronic solicitation, and violation of a protective order. Bemis claims that (1) K.S.A. 2018 Supp. 60-455(d) violates his due process rights under the United States and Kansas Constitutions; (2) there was insufficient evidence to support his conviction of electronic solicitation; and (3) the district court violated his constitutional rights when it increased his sentence based on his criminal history without requiring the State to include the criminal history in the charging

document and prove it beyond a reasonable doubt to a jury. For the reasons stated in this opinion, we reject Bemis' claims and affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

At around 3 p.m. on December 6, 2015, Wichita Police Officer Jason Emery responded to a report of a domestic violence disturbance at the home of Bemis; his significant other, K.K. (Mother); her 15-year-old daughter, C.K.; and Mother's two other minor children. When Emery arrived, he saw a van parked in front of the house and "items in the yard that obviously didn't belong in the yard . . . something from the house." There were several other people present, including C.K.; C.K.'s father, D.D. (Father), who lived in Hutchinson; Mother; and Mother's mother, D.K. (Grandmother).

At his sergeant's request, Emery spoke with C.K., who was sitting in another officer's patrol vehicle. C.K. was crying, and she told Emery that Father had recently found out that Bemis "had been touching her breasts and her crotch area over and underneath her clothing several times a week." At that point, Emery realized that he would pass the case to detectives and counselors in the Exploited and Missing Child Unit (EMCU), who were specifically trained to speak with minors about sexual abuse, so he decided to "back off" and not question C.K. further.

Wichita Police Officer James Pearman also responded to the scene. He spoke with Grandmother, who told him that she, C.K., and Father had come "to retrieve some of [C.K.'s] clothing and personal items to get [her] out of the house [be]cause there was a bad environment going on that they did not want her to be there." Although she was vague at first in explaining the "bad environment," Grandmother eventually told Pearman that C.K. and Bemis had "some sexual encounters," which Grandmother described as "consen[s]ual." Grandmother said that she believed there was only one "sexual encounter" that happened five or six months earlier.

2

As to the events of December 6, 2015, Grandmother said that Mother arrived at the house while they were moving some items into Father's van and Mother began yelling and removing items from the van. Mother threw a rock at Father and then threw a rock at the van, breaking the back passenger's side window. Grandmother said that after breaking the window, Mother took "a couple pill bottles" and left. Later that day, she was admitted to the hospital after a suicide attempt in which she took "a large quantity of medication."

Wichita Police Officer William Stevens also responded to the scene, and he spoke with Father, who had called the police after Mother broke the window in his van. Father said that C.K. had told Grandmother that she and Bemis had sexual intercourse. When Father talked to C.K., she said there had been "inappropriate touching," so Father, Grandmother, and C.K. went to collect C.K.'s belongings so she could go live with Father. Father told Stevens that during the verbal altercation with Mother, Mother said that it was C.K.'s fault that Bemis had sex with her.

Detective Kevin Brown of the EMCU was assigned to investigate. Brown reviewed the relevant reports and interviewed Father and C.K. on December 7, 2015. C.K. told Brown that the first time Bemis touched her inappropriately, he took her into her bedroom, removed her pants and underwear, and touched her between her legs. C.K. told Brown that there were many more incidents like that until September 2015, but she did not remember the details of each individual incident. C.K. did state that the last incident occurred in September 2015, which she remembered because it was around the blood moon; Brown later learned that the blood moon occurred on September 27, 2015.

C.K. told Brown that the last incident involved Bemis asking her to go into the bedroom he shared with Mother. She said that "she knew what was going to happen . . . and she just went along with . . . the situation." Bemis sat her down on the corner of the bed, removed her shirt and bra, and fondled her breasts. He then removed her pants and underwear and penetrated her vagina with his fingers. C.K. said that after several

3

minutes, Bemis stopped and left the room. C.K. told Brown that this happened about 30 times between June and September 2015; she also told Brown that Bemis was never naked and he never asked her to touch him.

C.K. told Brown that on the night of the blood moon, Mother "noticed something in disarray in the bedroom," and when Mother asked "if there was anything going on between" C.K. and Bemis, C.K. told Mother that there was something going on. During the interview, C.K. and Brown looked at text messages on C.K.'s cell phone, and C.K. signed a waiver for police to look at the contents of her phone. The cell phone contained a message from Mother to C.K. dated December 5, 2015, that stated: "'Do you realize everyone had a part in this. You could have stopped what was going on. He should never have tried anything. Both of you should never had continued anything. I should have been better in the beginning and nothing will ever be the same.'" Brown also saw a text message from C.K. to Bemis dated December 6, 2015, that stated: "'My dad came to pick me up from grandma's and my grandma told my dad. He knows and he's not happy."

On December 10, 2015, Brown secured Bemis' cell phone and examined it as well. It contained a text message conversation dated December 9, 2015, in which C.K. wrote to Bemis: "'FYI, grandma was under the impression that you and I had sex. She asked and I told her that it was only touching. She said that is why mother is acting the way she was because she thought you and I had sex. . . . Did you ever straight-out say we had sex to mom?'" Bemis replied, "'I'm thinking this is stuff we shouldn't talk about in texts.'"

On December 14, 2015, C.K. sent Brown an email, which he described as "asking for an update and [she] said this situation is tearing my family apart, this is not what I wanted at all, please let me know what is going on—going to happen next when you get the chance." Brown spoke with C.K. on the telephone, and she said she wanted to email him. At 10:12 p.m. that night, Brown received a second email from C.K.:

4

"'Hi. This is [C.K.] My family has had a lot of stress and anger caused by some issues between mom and [Bemis]. I had a lot of stress and anger building up. I wasn't thinking clearly and therefore I did not entirely tell the truth. Nothing about [Bemis] and I was true. . . . [T]here was just so much anger I didn't know how to react. I'm sorry. I love [Bemis] and mom and don't know exactly what all I wanted to come out of this. Maybe I just wanted to get them help. They both need it. I would prefer to communicate with you via e-mail from now on if you could. It is easier for me. Thank you.'"

On December 14, 2015, in case 15CR3558, the State charged Bemis with one count of indecent liberties with a child and one count of aggravated indecent liberties with a child. The district court issued a protective order preventing Bemis "from having any contact whatsoever with" C.K. Bemis was released on bond the next day.

On December 18, 2015, Brown again met with C.K., who told him that her allegations of sexual abuse by Bemis were false. Father and Grandmother had told Brown that Mother was texting C.K. and trying to get her to change her explanation about what had happened with Bemis. When Brown asked C.K. if she had told Grandmother or Father that Mother wanted her to lie, C.K. replied, "'I don't remember.'"

In Brown's two additional interviews of C.K., she maintained that nothing sexual had happened between her and Bemis. Because of what Father and Grandmother had told Brown about Mother texting C.K., Brown obtained a second download of C.K.'s cell phone. He discovered messages dated December 18, 2015, from Mother to C.K. that told her to "'[d]elete everything except the e-mail,'" and said, "'If you're worried about it, move all the pictures to your SD card and reset your phone to factory specs, that way he can't find any texts from me.'" Another message from Mother told C.K. not to take her cell phone to an appointment with Brown, and when C.K. replied that Father was "'making [her],'" Mother said that C.K. should "'delete everything. Turn it off and tell him you don't have it.'" Mother also suggested that C.K. "'[c]onveniently forget it at home.'"

On December 31, 2015, Father found an unfamiliar cell phone on his coffee table and began looking through it. C.K. later told Brown that Mother had given her the second phone at a Christmas celebration at Grandmother's home, which Bemis had also attended. When Father looked through the cell phone, he found "a whole list of inappropriate texts between" Bemis and C.K. Father asked C.K. about the text messages and she said, "[I]t's not that big a deal." Father turned the phone over to the police, and Brown obtained a download of the information on it. He found a text message from Bemis to C.K. dated December 27, 2015, that stated:  "'I miss you too. Wish I would have listened to you, just had to wait till summer.'"

Brown spoke with C.K. again on February 23, 2016. Brown asked her about a text from C.K. to Bemis dated December 6, 2015, that stated:

>  "'I'm sorry, I don't have much time. My dad is in the shower and doesn't want me talking to you so I'm going to make this quick. I'm going to try to keep you out of prison but you need to promise me that you will not do anything to any other girl ever again. I love you and I don't want you to go to prison. I wouldn't be able to live with myself. Am I blind or are you a good person? Do you promise?'"

A text message from Bemis responded: "I do." C.K. admitted that she had sent the first text message to Bemis. C.K., who by this point denied any sexual contact with Bemis, told Brown that the messages quoted above "refer[red] to his relationship with" Mother. C.K. also offered innocent explanations for other text messages found on her cell phone. For example, Brown asked C.K. about a text message conversation between Bemis and C.K. dated December 29, 2015, that referred to a hearing in Bemis' case being continued. Bemis told C.K. that his lawyer "'wants you to testify that I didn't do anything. It's been moved to the 7th at 9:00 a.m.'" C.K. responded, "'Okay.'" C.K. told Brown that "it's just [Bemis] telling me that I need to tell the truth." When Brown challenged that interpretation, C.K. replied that it was just "bad wording." When Brown asked C.K. about a December 30, 2015 message from Bemis to C.K. that stated, "'I remember waking up

6

and having a delicious breakfast of [C.K.] in the morning. What happened to that?'" C.K. said that it was "just a metaphor because 'I get up and we spend a lot of time in the morning with each other.'"

On March 23, 2016, the State charged Bemis in case 16CR797 with one count each of aggravated intimidation of a witness or victim, violation of a protective order, and electronic solicitation. Later, the State filed a motion in each case under K.S.A. 60-455(d) seeking to introduce evidence (1) of Bemis' "ongoing relationship" with C.K., and (2) that in 2002 Bemis pled no contest to and was convicted of one count of attempted aggravated indecent liberties with a child, his stepdaughter in a previous relationship, and he was sentenced to 51 months' imprisonment. The district court heard argument on the motion on June 19, 2017, after which it granted the motion, finding that the evidence was "more relevant and probative than prejudicial." The same day, the district court consolidated 15CR3558 and 16CR797 for trial.

The trial began on June 20, 2017. The State called its first witness, C.K., who was 16 years old by that time. C.K.'s testimony was contradictory. She maintained that she had made up the allegations against Bemis because he and Mother were not getting along and C.K. wanted "to get out of the house." C.K. admitted telling Grandmother and Mother that Bemis had touched her inappropriately, but when asked about the timing of her disclosures, C.K. testified that she did not remember.

Later in her testimony, after reviewing the transcript of an interview with Brown, C.K. acknowledged that she had told Brown that it was September 2015 when she first told Mother that "things were going on between" her and Bemis. The State introduced into evidence copies of the text messages forensically obtained from both of C.K.'s cell phones and from Bemis' cell phone.

7

After C.K.'s testimony, Grandmother testified that in "mid-summer" 2015, Mother made a comment "that something was going on between [Bemis] and [C.K.]" Grandmother did nothing with that information at the time. Moreover, Grandmother testified that she never talked to C.K. about the allegation until the day that the police became involved, and she never spoke about it with Mother again.

Father testified next for the State. He said that on December 5, 2015, C.K. asked him to pick her up at Grandmother's house and said she wanted to come live with him. When he got to Grandmother's house, Grandmother told him that "something's been going on between these two, and she kind of explained something sexual had been going on." According to Father, Grandmother said C.K. and "possibly" Mother had told her about the "relationship" between C.K. and Bemis. Father testified that Grandmother called C.K. into the room at that point, told C.K. that she had told Father "what had happened between her and [Bemis]," and asked C.K. if she had anything to say. C.K. said to Father, "'I didn't know how to tell you,'" and began crying. Father did not ask for details because "it was just really uncomfortable," but he told C.K. that they would retrieve her things the next day and she would come live with him.

After Father's testimony, the district court admitted the following stipulation into evidence:

"The parties hereby stipulate to the following:
    "1. On April 5, 2002, William Kyle Bemis entered a plea of no contest to one count of attempted aggravated indecent liberties with a child in Reno County, Kansas, District Court Case No. 01 CR 1173. As a result of his no contest plea, the Court found him guilty of attempted aggravated indecent liberties with a child.
    "2. That case involved allegations that William Kyle Bemis had engaged in sexual intercourse, oral copulation, and attempted anal sex with his stepdaughter, A.C., from the ages of 9 to 13 years old."

8

Next, the State called Mother as a witness. Mother acknowledged her December 2015 suicide attempt. She testified that before December 2015:

"I had some paranoid delusions that something was going on [between Bemis and C.K.] because of a mix of medications that I was on that was causing some pretty wicked side effects. We had an argument about me thinking something was going on, and after a long time of me badgering her and berating her she sarcastically responded there was something going on: Like, 'Yeah, mom, something's going on.'"

After Mother's testimony, the State called licensed social worker and addictions counselor Melissa Dorsett, who was assigned to Mother's case when Mother was admitted to the hospital in December 2015. When Dorsett asked Mother what had happened to bring about her hospitalization, Mother replied, "'I was fine until my daughter decided to pursue a relationship with my husband.'" Dorsett testified that Mother told her that C.K. and Bemis "had had sex" and that she had learned about "the relationship" around the time of the blood moon. As a mandatory reporter, Dorsett reported possible child abuse to the proper authorities on December 9 or 10, 2015.

The State also presented testimony from Emery, Pearman, Stevens, and Brown, consistent with the facts set forth above. After the State rested, Bemis moved for a directed verdict, which the district court denied. Bemis informed the district court that he did not intend to testify, and the defense rested. The district court instructed the jury and the parties gave their closing arguments. After deliberations, the jury found Bemis not guilty of aggravated intimidation of a witness or victim, but the jury found him guilty of the remaining charges.

At sentencing on August 18, 2017, the district court denied Bemis' motions for new trial, for judgment of acquittal, and for departure sentences. The district court sentenced Bemis to a controlling term of 268 months' imprisonment for the aggravated indecent liberties with a child and indecent liberties with a child convictions, to run

9

consecutive to 102 months' imprisonment for the electronic solicitation conviction and 12 months in the county jail for violating the protective order. Bemis timely appealed each case and this court consolidated the two appeals.

IS K.S.A. 2018 SUPP. 60-455(d) UNCONSTITUTIONAL?

Bemis first claims that K.S.A. 2018 Supp. 60-455(d) violates his due process rights under the United States and Kansas Constitutions. After setting forth his arguments at length, Bemis "acknowledges that another panel of this Court has rejected this claim," citing *State v. Boysaw*, 52 Kan. App. 2d 635, 372 P.3d 1261 (2016), *aff'd* 309 Kan. 526, 439 P.3d 909 (2019). The State asserts that this court should follow the well-reasoned logic of *Boysaw* and conclude that K.S.A. 2018 Supp. 60-455(d) is constitutional.

Bemis also acknowledges that he did not challenge the constitutionality of K.S.A. 2018 Supp. 60-455(d) in district court. But he asserts that consideration of the issue is necessary to serve the ends of justice or to prevent the denial of fundamental rights. See *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014). The State concedes that this court has previously considered this constitutional claim for the first time on appeal. Thus, we will address the merits of Bemis' claim.

Determining a statute's constitutionality is a question of law subject to unlimited review. *State v. Petersen-Beard*, 304 Kan. 192, 194, 377 P.3d 1127, *cert. denied* 137 S. Ct. 226 (2016).

Bemis asserts that this court wrongly decided the issue in *Boysaw*. But after the briefs were filed, the Kansas Supreme Court issued its opinion affirming this court's decision in *Boysaw* and holding that "K.S.A. 2018 Supp. 60-455(d) does not violate federal constitutional protections." *Boysaw*, 309 Kan. at 536. The Kansas Supreme Court declined to decide whether K.S.A. 2018 Supp. 60-455(d) violated any protections

10

provided under the Kansas Constitution Bill of Rights, finding that "Boysaw did not give the state constitutional argument sufficient substance for the district court to consider it, and, on appeal, he conflates the state argument with the federal one," leading our Supreme Court to deem the issue waived. 309 Kan. at 536-37.

Our Supreme Court's decision in *Boysaw* disposes of Bemis' federal constitutional challenge to K.S.A. 2018 Supp. 60-455(d). Neither Bemis nor the State filed a letter of supplemental authority as authorized by Kansas Supreme Court Rule 6.09 (2019 Kan. S. Ct. R. 39) to notify this court of this recently issued controlling authority. But this court is duty bound to follow Kansas Supreme Court precedent absent some indication that the court is departing from its earlier position. See *State v. Hall*, 298 Kan. 978, 983, 319 P.3d 506 (2014). Thus, Bemis' federal constitutional challenge fails.

Bemis also raised a state constitutional challenge to K.S.A. 2018 Supp. 60-455(d), and that challenge is not controlled by our Supreme Court's decision in *Boysaw*. That said, the Kansas Supreme Court in *Boysaw* stated the following, albeit in dicta:

> "As possible considerations for any future argument on this [Kansas constitutional] issue, we note that the Kansas Constitution Bill of Rights, including sections 10 and 18, was largely modeled on the Ohio Constitution. Ohio has a statute that resembles K.S.A. 2018 Supp. 60-455 in allowing evidence of prior misconduct for the purpose of showing motive, intent, absence of mistake, or scheme or plan. Ohio does not, however, have a statutory provision allowing such evidence strictly for the purpose of demonstrating propensity. Furthermore, our cursory research fails to disclose any common law exception in Ohio allowing evidence akin to 'lustful disposition' for purposes of establishing propensity to commit sex crimes.
>
> "We also note that section 18 of the Kansas Constitution Bill of Rights did not create new rights but merely recognized systems of laws established prior to the adoption of the Constitution.
>
> "Historically, our courts have analyzed sections 10 and 18 as coextensive with their federal counterparts.

"Any future challenge to the admission of propensity evidence under K.S.A. 2018 Supp. 60-455(d) that is based on state constitutional provisions will need to explain why this court should depart from its long history of coextensive analysis of rights under the two constitutions. [Citations omitted.]" 309 Kan. at 537-38.

The Kansas Supreme Court issued its decision in *Boysaw* on April 19, 2019. Despite the more than four months that have now passed, Bemis has failed to heed the warning in *Boysaw*. His appellate brief asserts that this court has the authority to interpret differently similar provisions of the Kansas and federal Constitutions, but it contains no explanation of "why this court should depart from its long history of coextensive analysis of rights under the two constitutions." See *Boysaw*, 309 Kan. at 538. In fact, Bemis' appellate brief develops no specific argument as to why he is entitled to greater protection under the Kansas Constitution than he is afforded under the federal Constitution. And he has not filed a motion for supplemental briefing to provide such an explanation to this court. As our Supreme Court noted in *Boysaw*, "[w]hen a party does not preserve or adequately brief an issue, we deem it waived." 309 Kan. at 537. Thus, we deem Bemis' state constitutional argument waived for inadequate briefing.

## SUFFICIENCY OF THE EVIDENCE TO SUPPORT BEMIS' CONVICTION OF ELECTRONIC SOLICITATION

Bemis claims there was insufficient evidence to support his conviction of electronic solicitation of a child. The State responds that when the evidence is viewed in the light most favorable to the State, sufficient evidence supports Bemis' electronic solicitation conviction.

"To meet the sufficiency standard, evidence must support each element of a crime. When challenged, an appellate court reviews the evidence's sufficiency by '"looking at all the evidence in a light most favorable to the prosecution and determining whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt."' 'In doing so, the appellate court generally will "not reweigh evidence, resolve

12

evidentiary conflicts, or make witness credibility determinations."' [Citations omitted.]"
*State v. Parker*, 309 Kan. 1, 13-14, 430 P.3d 975 (2018).

"Electronic solicitation is, by means of communication conducted through the telephone, internet or by other electronic means, enticing or soliciting a person, whom the offender believes to be a child, to commit or submit to an unlawful sexual act." K.S.A. 2018 Supp. 21-5509(a). Bemis contends and the State concedes that to support the charge of electronic solicitation, the prosecutor relied on Bemis' text message to C.K. that stated: "'I remember waking up and having a delicious breakfast of [C.K.] in the morning. What happened to that?'"

Bemis first argues that there was insufficient evidence that he "enticed" or "solicited" C.K. to commit or submit to an unlawful sexual act. The jury was not instructed on a specific definition of "entice" or "solicit." Bemis correctly points out that "solicit" is statutorily defined, in the context of the criminal code, to mean "command, authorize, urge, incite, request or advise." K.S.A. 2018 Supp. 21-5111(cc).

Bemis asserts that the text in question contains no language commanding, authorizing, urging, inciting, requesting, or advising C.K. to commit or submit to any unlawful sexual act, so there was insufficient evidence to support his conviction of electronic solicitation. The State responds that when considered in the context of the rest of the evidence presented at trial, it is a reasonable inference that the question, "What happened to that?" was a request that C.K. submit to a future unlawful sexual act of indecent liberties with a child.

The texts reproduced in State's Exhibit 5 show the following conversation between C.K. and Bemis between 11:18 p.m. and 11:27 p.m. on December 27, 2015:

C.K.: "I ate some bad food and now I have a stomach ache"

13

Bemis: "Aww. I'll rub you down with lotion and make ya feel all better."

C.K.: "I have been super home sick since we picked up [C.K.'s friend]. And I would love that."

Bemis: "I promise to make it up to ya."

C.K.: "[Smiley face emoji]"

Bemis: "I'll start on your back rubbing in the lotion. Nice and soft."

C.K.: "Don't say anything that might upset anyone"

Bemis: "Are you gettin upset"

C.K.: "No[.] Someone else might get upset"

Bemis: "I delete all my texts from this phone"

C.K.: "Just in case[.] Ok? We don't need anyone unhappy with us"

Bemis: "No one knows I have this phone[.] Ok. I will bow down to my queen[.]"

Over the next 48 hours, Bemis and C.K. exchanged over 90 text messages, many of which involved assertions of their love. On December 29, 2015, at 11:40 p.m., Bemis sent C.K. a text that said: "[C.K.] I love you to pieces. I want you so bad I hurt." He sent a second text that said, "Goodnight." The next text message occurred at 7:54 a.m. on December 30, 2015, and it was the text referring to "a delicious breakfast of [C.K.] in the morning. What happened to that?"

Taken in context and considered in the light most favorable to the State, a reasonable juror could infer that Bemis' reference to "a delicious breakfast of" C.K. followed by the question, "What happened to that?" was a reference to prior unlawful sexual activity and a request that C.K. submit to the same in the future. Thus, the State presented sufficient evidence that Bemis' text message constituted solicitation or enticement of C.K. as needed to support the conviction of electronic solicitation.

14

*Alternative means argument*

Bemis also raises an alternative means argument. "An alternative means case arises when 'a statute—and any instruction that incorporates it . . . list[s] distinct alternatives for a material element of the crime.'" *State v. Williams*, 303 Kan. 750, 757, 368 P.3d 1065 (2016). The State failed to respond to Bemis' alternative means claim.

As set forth above, "[e]lectronic solicitation is, by means of communication conducted through the telephone, internet or by other electronic means, enticing or soliciting a person, whom the offender believes to be a child, to commit or submit to an unlawful sexual act." K.S.A. 2018 Supp. 21-5509(a). Bemis does not argue that the statutory definition of electronic solicitation creates an alternative means of committing the crime. Rather, he focuses on the district court's jury instruction, which reads:

> "The defendant is charged in Count 5 with electronic solicitation of a child. The defendant pleads not guilty.
> "To establish this charge, each of the following claims must be proved:
> "1. The defendant by means of communication conducted through the telephone, internet, or by other electronic means enticed or solicited [C.K.] to commit or submit to an act of indecent liberties with a child.
> "2. The defendant did it intentionally or knowingly.
> "3. [C.K.] was a person whom the defendant believed was 14 or 15 years old.
> "4. This act occurred on or about the 30th day of December, 2015, in Sedgwick County, Kansas.
> "The act of indecent liberties with a child means engaging in either of the following acts with a child who is 14 or 15 years old: (1) any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or satisfy the sexual desires of either the child or the offender or both; (2) soliciting the child to engage in any lewd fondling or touching of the person of another with the intent to arouse or satisfy the sexual desires of the child, offender or another.
> "The State must prove that the defendant enticed or solicited [C.K.] to commit or submit to an act of indecent liberties with a child intentionally or knowingly.

15

"A defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about by the State.

"A defendant acts knowingly when the defendant is aware of the nature of his conduct that the State complains about."

Bemis argues that the portion of the jury instruction defining indecent liberties with a child creates two alternative means of committing the crime: (1) any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or satisfy the sexual desires of either the child or the offender or both; or (2) soliciting the child to engage in any lewd fondling or touching *of the person of another* with the intent to arouse or satisfy the sexual desires of the child, offender, or another. Bemis asserts that the State failed to present any evidence of the second alternative means of committing the crime of indecent liberties with a child, i.e., that he enticed or solicited C.K. to engage in lewd fondling or touching with a third party.

The Kansas Supreme Court has recognized that identical language in the statute defining aggravated indecent liberties with a child creates alternative means of committing that crime. See *State v. Brown*, 295 Kan. 181, 200-01, 284 P.3d 977 (2012). Also, the Kansas Supreme Court has long interpreted the phrase "fondling or touching of the person of another" to mean fondling or touching of a third party who is neither the child nor the offender. See *State v. Johnson*, 283 Kan. 649, 653, 156 P.3d 596 (2007).

Bemis directs the court to *State v. Herrera*, 41 Kan. App. 2d 215, 223-24, 202 P.3d 68 (2009), in which this court noted the holding from *Johnson* and applied it to analyze whether the evidence in the case before it was sufficient to sustain a conviction of aggravated indecent liberties with a child under the statutory subsection that prohibits "solicit[ing] a child to engage in lewd fondling or touching of a third party." The *Herrera* court held that the evidence in that case was insufficient to support the conviction because "[t]he State presented no evidence that [the defendant] had solicited [the victim]

16

to engage in any activity that might be construed as lewd fondling or touching of any person other than [the defendant]." 41 Kan. App. 2d at 224.

Similarly, the State presented no evidence here that Bemis solicited C.K. "to engage in any lewd fondling or touching of the person of another," and there was no evidence that a third party was involved in Bemis' sexual crimes against C.K. Thus, Bemis argues that there was insufficient evidence to support one of the alternative means of committing the crime of indecent liberties with a child. Because indecent liberties with a child was the alleged "unlawful sexual act" that Bemis solicited C.K. to commit, Bemis argues there was insufficient evidence to support his conviction of electronic solicitation.

We begin our analysis by ascertaining whether electronic solicitation is an alternative means crime. In *Brown*, our Supreme Court set forth the following test for analyzing an alternative means claim:

"When faced with an alternative means question, a court must determine for each statute what the legislature's use of a disjunctive 'or' is intended to accomplish. Is it to list alternative distinct, material elements of a crime—that is, the necessary *mens rea, actus reus,* and, in some statutes, a causation element? Or is it merely to describe a material element or a factual circumstance that would prove the crime? The listing of alternative material elements, when the list is incorporated into an elements instruction, creates an alternative means issue demanding super-sufficiency of the evidence. But merely describing a material element or a factual circumstance that would prove the crime does not create alternative means, even if the description is included in a jury instruction." 295 Kan. 181, Syl. ¶ 7.

The *Brown* court also recognized that "[o]ptions within a means—that is, the existence of options that do not state a material, distinct element—do not demand application of the super-sufficiency requirement. [Citations omitted.]" 295 Kan. at 197. One potential type of options within a means recognized—but not applied—in *Brown*

17

was "purely definitional statutory language that elaborates on or describes a material element." 295 Kan. at 198. Bemis' claim ignores the fact that his asserted alternative means error is not based on the statutory definition of electronic solicitation; it is based only on the definitional language in the jury instruction that describes an element of the crime—in this case the unlawful sexual act that Bemis enticed C.K. to commit.

In *State v. Waldrup*, 46 Kan. App. 2d 656, 263 P.3d 867 (2011), *rev. denied* 296 Kan. 1135 (2013), the defendant was charged with two counts of sale of cocaine. Along with instructing the jury on the elements of the crime of sale of cocaine, the district court also defined "sale" to mean "'barter, exchange, or gift, or an offer to do any of these things.'" 46 Kan. App. 2d at 663. This court found that the definition of the term "sale" was an "explanatory definition" that merely clarified the word "sale" as opposed to a "fundamental definition" that defines the charged crime itself. 46 Kan. App. 2d at 668-69. Thus, this court held that in a prosecution of the defendant for the sale of cocaine, the district court's definitional jury instruction of the term "sale" did not create alternative means of committing the crime. 46 Kan. App. 2d at 669.

Here, to find Bemis guilty of electronic solicitation of a child, the jury had to agree that Bemis enticed or solicited C.K. to commit or submit to an act of indecent liberties with a child. This is not an alternative means crime under the test set forth in *Brown*. The mere fact that the district court defined "indecent liberties with a child" in a manner that included alternative means did not require the State to present substantial evidence supporting each alternative means of committing that separate crime. Coincidentally, Bemis was also charged with the crime of indecent liberties with a child and the jury instruction on that charge did not include alternative means of committing the crime.

Although not directly on point, further support for the conclusion that the jury instruction here did not create alternative means may be found in *State v. Butler*, 307 Kan. 831, 416 P.3d 116 (2018), and *State v. Cottrell*, 310 Kan. ___, 445 P.3d 1132

18

(2019). Butler was charged with conspiracy to commit aggravated robbery. To prove conspiracy, the State must prove two elements: "'"(1) An agreement between two or more persons to commit or assist in committing a crime and (2) the commission by one or more of the conspirators of an overt act in furtherance of the object of the conspiracy.'" [Citation omitted.]" 307 Kan. at 842. The *Butler* court noted that the statute defining conspiracy "does not list alternative ways a fact-finder could conclude the defendant committed an overt act in furtherance of the conspiracy; it simply states a conviction cannot occur unless an overt act is alleged and proved," and that Butler's asserted "alternative means" occurred only in the jury instruction. 307 Kan. at 842. The Kansas Supreme Court held that "'[t]hat alone indicates the legislature never intended for cases like [defendant's] to be alternative means cases,'" and the statute itself did not set forth alternative means for committing an overt act. 307 Kan. at 842.

Butler argued, however, that the jury instruction, which identified the overt acts alleged as "discussing and planning the aggravated robbery, arriv[ing] at the location, and carr[ying] out the plan," created alternative means. 307 Kan. at 842-43. First, the Kansas Supreme Court noted that the instruction used the word "and," which indicated that the jury must find *all* of these overt acts in order to convict. 307 Kan. at 843. Although the court thus concluded that *Butler* was not an alternative means case, it specifically pointed out that it was not analyzing whether prior decisions in which the court "expressed concern" over whether an alternative means issue would arise if a jury was given a disjunctive list of alleged overt acts remained valid after *Brown*. 307 Kan. at 844.

Our Supreme Court undertook that analysis in *Cottrell*. 445 P.3d at 1140-42. After summarizing the relevant holding in *Butler*, the *Cottrell* court held:

> "Following *Brown*, we affirm that only the language of a statute can create
> alternative means for a crime. If the statute lists 'alternative, distinct, material elements' of
> a crime, then it creates alternative means. But a jury instruction that lists descriptions of

19

how a material element might be satisfied does not, on its own, create alternative means. To hold otherwise would permit a jury instruction to override legislative intent and effectively revise the criminal code.

"Thus, we affirm that the conspiracy statute does not set forth alternative means for committing an over act. We also overrule [a prior case to the contrary] and hold that a jury instruction listing more than one overt act in furtherance of a conspiracy does not create alternative means. Instead, such an instruction merely describes the factual scenarios that could prove the material element of an overt act." 445 P.3d at 1141-42.

*Cottrell* makes clear that the focus of alternative means analysis in Kansas is on the statutory language of the crime of conviction. Bemis has not filed a Rule 6.09 letter addressing the effect of *Cottrell*, and he does not argue that the statutory language of the electronic solicitation statute created an alternative means issue in his case. Thus, the jury instruction language Bemis now challenges merely describes the factual scenarios that could prove that Bemis solicited or enticed C.K. to engage in an unlawful sexual act. Under *Cottrell*, this is not an alternative means case.

Finally, even if there was an alternative means error created by the jury instruction on the charge of electronic solicitation, we submit that any error was harmless. The State presented absolutely *no evidence* and made no argument that Bemis solicited C.K. to engage in any lewd fondling or touching of a third party, so there could not have been any confusion by the jury on how Bemis committed the crime of indecent liberties with a child—which in turn was the unlawful sexual act supporting the electronic solicitation charge. An alternative means error is harmless when there is substantial evidence of one alternative means of committing the crime but *no* evidence or argument regarding another means and thus no possibility of jury confusion. See *Brown*, 295 Kan. at 216 (Moritz, J., concurring); *State v. Shaw*, 47 Kan. App. 2d 994, 1010, 281 P.3d 576 (2012), *rev. denied*, 297 Kan. 1255 (2013) (Malone, J., concurring). Although we need not reach the issue of harmless error in this case, we respectfully submit that the Kansas Supreme Court should

20

reevaluate its holding in *State v. Wright*, 290 Kan. 194, 205, 224 P.3d 1159 (2010), that an alternative means error can never be harmless.

SENTENCING ISSUE

Finally, Bemis claims the district court violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution, as set forth in *Apprendi v. New Jersey*, 530 U.S. 466, 477, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), when it increased his sentence based on his criminal history without requiring the State to include the criminal history in the charging document and prove it beyond a reasonable doubt to a jury. Bemis concedes that the Kansas Supreme Court has rejected his argument; he raises it to preserve it for federal review. See *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002). This court is duty bound to follow Kansas Supreme Court precedent absent some indication that the court is departing from its earlier position. See *Hall*, 298 Kan. at 983. There is no such indication here, so Bemis' sentencing issue fails.

Affirmed.